783 A.2d 707

J.B., PLAINTIFF–RESPONDENT, v. M.B., DEFENDANT–
APPELLANT, AND C.C., DEFENDANT.

Argued February 26, 2001—Decided August 14, 2001.

*Eric S. Spevak* and *Andrew L. Rochester* argued the cause for appellant (*Adinolfi and Spevak,* attorneys; *Mr. Spevak, Mr. Rochester, Sandra E. Yampell* and *Richard M. Chiumento,* on the briefs).

*James Katz* argued the cause for respondent (*Sagot, Jennings & Sigmond,* attorneys).

*Lenora M. Lapidus,* Former Legal Director, submitted a letter in lieu of brief on behalf of amici curiae, American Civil Liberties Union of New Jersey, American Society for Reproductive Medicine and RESOLVE (*J.C. Salyer,* Staff Attorney, attorney).

*Russell J. Passamano,* submitted a brief on behalf of amicus curiae LifeNet, Inc.

The opinion of the Court was delivered by

PORITZ, C.J.

In this case, a divorced couple disagree about the disposition of seven preembryos [1] that remain in storage after the couple, during their marriage, undertook in vitro fertilization procedures. We must first decide whether the husband and wife have entered into an enforceable contract that is now determinative on the disposition issue. If not, we must consider how such conflicts should be resolved by our courts.

Although the reproductive technology to accomplish in vitro fertilization has existed since the 1970s, there is little caselaw to guide us in our inquiry.

**I**

**A**

J.B. and M.B. were married in February 1992. After J.B. suffered a miscarriage early in the marriage, the couple encountered difficulty conceiving a child and sought medical advice from the Jefferson Center for Women's Specialties. Although M.B. did not have infertility problems, J.B. learned that she had a condition that prevented her from becoming pregnant. On that diagnosis, the couple decided to attempt in vitro fertilization at the Cooper Center for In Vitro Fertilization, P.C. (the Cooper Center).

The in vitro fertilization procedure requires a woman to undergo a series of hormonal injections to stimulate the production of mature oocytes [2] (egg cells or ova). The medication causes the ovaries to release multiple egg cells during a menstrual cycle rather than the single egg normally produced. The egg cells are

---

[1] A preembryo is a fertilized ovum (egg cell) up to approximately fourteen days old (the point when it implants in the uterus). *The American Heritage Stedman's Medical Dictionary* 667 (1995). Throughout this opinion, we use the term "preembryo," rather than "embryo," because preembryo is technically descriptive of the cells' stage of development when they are cryopreserved (frozen).

[2] Oocytes are cells from which an egg or ovum develops. *Id.* at 578.

retrieved from the woman's body and examined by a physician who evaluates their quality for fertilization. Egg cells ready for insemination are then combined with a sperm sample and allowed to incubate for approximately twelve to eighteen hours. Successful fertilization results in a zygote [3] that develops into a four- to eight-cell preembryo. At that stage, the preembryos are either returned to the woman's uterus for implantation or cryopreserved at a temperature of –196 C and stored for possible future use.

A limited number of preembryos are implanted at one time to reduce the risk of a multiple pregnancy. Cryopreservation of unused preembryos reduces, and may eliminate, the need for further ovarian stimulation and egg retrieval, thereby reducing the medical risks and costs associated with both the hormone regimen and the surgical removal of egg cells from the woman's body. Cryopreservation also permits introduction of the preembryos into the uterus at the optimal time in the natural cycle for pregnancy. Egg cells must be fertilized before undergoing cryopreservation because unfertilized cells are difficult to preserve and, once preserved, are difficult to fertilize.

The Cooper Center's consent form describes the procedure:

IVF [or in vitro fertilization] will be accomplished in a routine fashion: that is, ovulation induction followed by egg recovery, insemination, fertilization, embryo development and embryo transfer of up to three or four embryos in the stimulated cycle. With the couple's consent, any "extra" embryos beyond three or four will be cryopreserved according to our freezing protocol and stored at –196C. Extra embryos, upon thawing, must meet certain criteria for viability before being considered eligible for transfer. These criteria require that a certain minimum number of cells composing the embryo survive the freeze-thaw process. These extra embryos will be transferred into the woman's uterus in one or more future menstrual cycles for the purpose of establishing a normal pregnancy. The physicians and embryologists on the IVF team will be responsible for determining the appropriate biological conditions and the timing for transfers of cryopreserved embryos.

The consent form also contains language discussing the control and disposition of the preembryos:

---

[3] A zygote is a fertilized ovum before it undergoes cell division. *Id.* at 906.

> The control and disposition of the embryos belongs to the Patient and her Partner. You will be asked to execute the attached legal statement regarding control and disposition of cryopreserved embryos. The IVF team will not be obligated to proceed with the transfer of any cryopreserved embryos if experience indicates the risks outweigh the benefits.

Before undertaking in vitro fertilization in March 1995, the Cooper Center gave J.B. and M.B. the consent form with an attached agreement for their signatures. The agreement states, in relevant part:

> I, J.B. (patient), and M.B. (partner), agree that all control, direction, and ownership of our tissues will be relinquished to the IVF Program under the following circumstances:
>
> 1. A dissolution of our marriage by court order, unless the court specifies who takes control and direction of the tissues. . . .

## B

The in vitro fertilization procedure was carried out in May 1995 and resulted in eleven preembryos. Four were transferred to J.B. and seven were cryopreserved. J.B. became pregnant, either as a result of the procedure or through natural means, and gave birth to the couple's daughter on March 19, 1996. In September 1996, however, the couple separated, and J.B. informed M.B. that she wished to have the remaining preembryos discarded. M.B. did not agree.

J.B. filed a complaint for divorce on November 25, 1996, in which she sought an order from the court "with regard to the eight [4] frozen embryos." In a counterclaim filed on November 24, 1997, M.B. demanded judgment compelling his wife "to allow the (8) eight frozen embryos currently in storage to be implanted or donated to other infertile couples." J.B. filed a motion for summary judgment on the preembryo issue in April 1998 alleging, in a certification filed with the motion, that she had intended to use the preembryos solely within her marriage to M.B. She stated:

> Defendant and I made the decision to attempt conception through in vitro fertilization treatment. Those decisions were made during a time when defendant

---

4 As noted above, seven had actually been cryopreserved.

and I were married and intended to remain married. Defendant and I planned to raise a family together as a married couple. I endured the in vitro process and agreed to preserve the preembryos for our use in the context of an intact family.

J.B. also certified that "[t]here were never any discussions between the Defendant and I regarding the disposition of the frozen embryos should our marriage be dissolved."

M.B., in a cross-motion filed in July 1998, described his understanding very differently. He certified that he and J.B. had agreed prior to undergoing the in vitro fertilization procedure that any unused preembryos would not be destroyed, but would be used by his wife or donated to infertile couples. His certification stated:

Before we began the I.V.F. treatments, we had many long and serious discussions regarding the process and the moral and ethical repercussions. For me, as a Catholic, the I.V.F. procedure itself posed a dilemma. We discussed this issue extensively and had agreed that no matter what happened the eggs would be either utilized by us or by other infertile couples. In fact, the option to donate [the preembryos] to infertile couples was the Plaintiff's idea. She came up with this idea because she knew of other individuals in her work place who were having trouble conceiving.

M.B.'s mother, father, and sister also certified that on several occasions during family gatherings J.B. had stated her intention to either use or donate the preembryos.

The couple's final judgment of divorce, entered in September 1998, resolved all issues except disposition of the preembryos. Shortly thereafter, the trial court granted J.B.'s motion for summary judgment on that issue. The court found that the reason for the parties' decision to attempt in vitro fertilization—to create a family as a married couple—no longer existed. J.B. and M.B. had become parents and were now divorced. Moreover, M.B. was not infertile and could achieve parenthood in the future through natural means. The court did not accept M.B.'s argument that the parties undertook the in vitro fertilization procedure to "create life," and found no need for further fact finding on the existence of an agreement between them, noting that there was no written contract memorializing the parties' intentions. Because the husband was "fully able to father a child," and because he sought control of the preembryos "merely to donate them to another

couple," the court concluded that the wife had "the greater interest and should prevail."

The Appellate Division affirmed. *J.B. v. M.B.*, 331 *N.J.Super.* 223, 751 *A.*2d 613 (2000). The court noted the inconsistency between the trial court's finding that "the parties engaged in IVF to create their child within the context of their marriage" and M.B.'s claim that the couple had entered into an agreement to donate or use, and not to destroy, the preembryos. *Id.* at 228, 751 *A.*2d 613. Before the Appellate Division, the husband argued that his constitutional right to procreate had been violated by the ruling of the trial court and sought a remand to establish the parties' understanding regarding the disposition of the preembryos. *Ibid.*

The Appellate Division understood this case to "involv[e] an attempt to enforce an alleged agreement to use embryos to create a child." *Id.* at 231, 751 *A.*2d 613. It initially examined that "attempt" in the context of two fundamental rights, "the right to procreate and the right not to procreate," citing *Skinner v. Oklahoma,* 316 *U.S.* 535, 541, 62 *S.Ct.* 1110, 1113, 86 *L.Ed.* 1655, 1660 (1942), and *Roe v. Wade,* 410 *U.S.* 113, 152–53, 93 *S.Ct.* 705, 726, 35 *L.Ed.*2d 147, 176–77 (1973), among other cases. *J.B., supra,* 331 *N.J.Super.* at 231–32, 751 *A.*2d 613. The court found that, on the facts presented, the conflict between those rights was "more apparent than real." *Id.* at 232, 751 *A.*2d 613. It observed that destruction of the preembryos would not seriously impair M.B.'s constitutional right to procreate since "he retains the capacity to father children." *Ibid.* In contrast, allowing donation or use of the preembryos would impair J.B.'s right not to procreate "[e]ven if [she was] relieved of the financial and custodial responsibility for her child" because she would then have been forced to allow strangers to raise that child. *Ibid.* In those circumstances, and assuming "that the Fourteenth Amendment applies," the court found no impairment of the husband's constitutional rights. *Ibid.*

Nonetheless, the court chose not to decide this case on constitutional grounds. *Id.* at 233, 751 *A.*2d 613. In its view, whether court enforcement of the alleged agreement would constitute state action under the Fourteenth Amendment was unclear, and resolution of the constitutional issue was not necessary to dispose of the litigation. *Id.* at 233–34, 751 *A.*2d 613. The court concluded "that a contract to procreate is contrary to New Jersey public policy and is unenforceable." *Id.* at 234, 751 *A.*2d 613. In affirming the judgment of the trial court in favor of J.B., the panel considered the parties' views and the trial court's opinion, and determined that destruction of the preembryos was required. *Id.* at 235, 751 *A.*2d 613.

We granted certification, 165 *N.J.* 530, 760 *A.*2d 783 (2000), and now modify and affirm the judgment of the Appellate Division.

## C

M.B. contends that the judgment of the court below violated his constitutional rights to procreation and the care and companionship of his children. He also contends that his constitutional rights outweigh J.B.'s right not to procreate because her right to bodily integrity is not implicated, as it would be in a case involving abortion. He asserts that religious convictions regarding preservation of the preembryos, and the State's interest in protecting potential life, take precedence over his former wife's more limited interests. Finally, M.B. argues that the Appellate Division should have enforced the clear agreement between the parties to give the preembryos a chance at life. He believes that his procedural due process rights have been violated because he was not given an opportunity to introduce evidence demonstrating the existence of that agreement, and because summary judgment is inappropriate in a case involving novel issues of fact and law.

J.B. argues that the Appellate Division properly held that any alleged agreement between the parties to use or donate the preembryos would be unenforceable as a matter of public policy. She contends that New Jersey has "long recognized that individu-

als should not be bound by agreements requiring them to enter into family relationships or [that] seek to regulate personal intimate decisions relating to parenthood and family life." J.B. also argues that in the absence of an express agreement establishing the disposition of the preembryos, a court should not imply that an agreement exists. It is J.B.'s position that requiring use or donation of the preembryos would violate her constitutional right not to procreate. Discarding the preembryos, on the other hand, would not significantly affect M.B.'s right to procreate because he is fertile and capable of fathering another child.

LifeNet, Inc. (LifeNet) and the American Civil Liberties Union of New Jersey, the American Society for Reproductive Medicine, and RESOLVE, a national Infertility Association (ACLU *Amici* ), have participated as *amici curiae* before the Appellate Division and now before this Court. LifeNet urges the Court not to allow destruction of the preembryos. The ACLU *Amici* argue that, although agreements governing disposition of preembryos should be presumed to be enforceable, agreements compelling implantation violate public policy by forcing parenthood on the non-consenting donor. The ACLU *Amici* argue further that in the absence of an agreement the right not to procreate should, in general, outweigh the right to procreate.

## II

M.B. contends that he and J.B. entered into an agreement to use or donate the preembryos, and J.B. disputes the existence of any such agreement. As an initial matter, then, we must decide whether this case involves a contract for the disposition of the cryopreserved preembryos resulting from in vitro fertilization. We begin, therefore, with the consent form provided to J.B. and M.B. by the Cooper Center. *Cf. Garfinkel v. Morristown Obstetrics & Gynecology*, 168 *N.J.* 124, 135, 773 *A.2d* 665 (2001) (noting intent expressed in writing controls interpretation of contract); *State Troopers Fraternal Assoc. v. State*, 149 *N.J.* 38, 47, 692 *A.2d* 519 (1997) (noting fundamental canons of contract construction

require examination of plain language of contract). That form states, among other things:

> The control and disposition of the embryos belongs to the Patient and her Partner. You will be asked to execute the attached legal statement regarding control and disposition of cryopreserved embryos.

The attachment, executed by J.B. and M.B., provides further detail in respect of the parties' "control and disposition":

> I, J.B. (patient), and M.B. (partner) agree that all control, direction, and ownership of our tissues will be relinquished to the IVF Program under the following circumstances:
>
> 1. A dissolution of our marriage by court order, unless the court specifies who takes control and direction of the tissues, or
>
> 2. In the event of death of both of the above named individuals, or unless provisions are made in a Will, or
>
> 3. When the patient is no longer capable of sustaining a normal pregnancy, however, the couple has the right to keep embryos maintained for up to two years before making a decision [regarding a] "host womb" or
>
> 4. At any time by our/my election which shall be in writing, or
>
> 5. When a patient fails to pay periodic embryo maintenance payment.

The consent form, and more important, the attachment, do not manifest a clear intent by J.B. and M.B. regarding disposition of the preembryos in the event of "[a] dissolution of [their] marriage." Although the attachment indicates that the preembryos "will be relinquished" to the clinic if the parties divorce, it carves out an exception that permits the parties to obtain a court order directing disposition of the preembryos. That reading is consistent with other provisions of the attachment allowing for disposition by a last will and testament "[i]n the event of death," or "by our/my election ... in writing." Clearly, the thrust of the document signed by J.B. and M.B. is that the Cooper Center obtains control over the preembryos unless the parties choose otherwise in a writing, or unless a court specifically directs otherwise in an order of divorce.

The conditional language employed in the attachment stands in sharp contrast to the language in the informed consents provided by the hospital in *Kass v. Kass*, 91 *N.Y.*2d 554, 673 *N.Y.S.*2d 350, 696 *N.E.*2d 174 (1998). In *Kass*, the New York Court of Appeals enforced a couple's memorialized decision to donate their

preembryos for scientific research when they could not agree on disposition. *Id.*, 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 182. The court found that the parties had signed an unambiguous contract to relinquish control of their preembryos to the hospital for research purposes in the event of a dispute. *Id.*, 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 181. In that case, the parties executed several forms before undergoing in vitro fertilization. *Id.*, 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 176–77. Informed Consent No. 2 stated:

> In the event of divorce, we understand that legal ownership of any stored pre-zygotes [5] must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction.
> [*Id.*, 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 176.]

Addendum No. 2–1 further elaborated:

> In the event that we . . . are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes, we now indicate our desire for the disposition of our pre-zygotes and direct the IVF Program to (choose one):
> Our frozen pre-zygotes may be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program.
> [*Id.*, 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 176–77.]

Moreover, before the parties divorced, they drafted and signed an " 'uncontested divorce' agreement" indicating that their preembryos "should be disposed of [in] the manner outlined in our consent form and [neither party] will lay claim to custody of these pre-zygotes." *Id.*, 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 177.[6]

The *Kass* court found that the parties had agreed to donate their preembryos for IVF research if they could not together decide on another disposition. *Id.*, 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 181. The court interpreted the provision of the consent form dealing directly with divorce to indicate only that the parties' agreement would be embodied in a document of divorce, noting that the couple had, indeed, endorsed an " 'uncontested divorce'

---

[5] The term "pre-zygote" is used in the forms and in the opinion of the New York court where this opinion uses the term "preembryo."

[6] Although the agreement was never finalized, it was accepted by the New York court as "reaffirm[ing] the [parties'] earlier understanding. . . ." *Id.* at 181.

instrument" ratifying the consent forms they had signed earlier. *Ibid.* That holding is based on language entirely different from the language in the form in this case. Here, the parties have agreed that on the dissolution of their marriage the Cooper Center obtains control of the preembryos unless the court specifically makes another determination. Under that provision, the parties have sought another determination from the court.

M.B. asserts, however, that he and J.B. jointly intended another disposition. Because there are no other writings that express the parties' intentions, M.B. asks the Court either to remand for an evidentiary hearing on that issue or to consider his certified statement. In his statement, he claims that before undergoing in vitro fertilization the couple engaged in extensive discussions in which they agreed to use the preembryos themselves or donate them to others. In opposition, J.B. has certified that the parties never discussed the disposition of unused preembryos and that there was no agreement on that issue.

We find no need for a remand to determine the parties' intentions at the time of the in vitro fertilization process. Assuming that it would be possible to enter into a valid agreement at that time irrevocably deciding the disposition of preembryos in circumstances such as we have here, a formal, unambiguous memorialization of the parties' intentions would be required to confirm their joint determination. The parties do not contest the lack of such a writing. We hold, therefore, that J.B. and M.B. never entered into a separate binding contract providing for the disposition of the cryopreserved preembryos now in the possession of the Cooper Center.

### III

In essence, J.B. and M.B. have agreed only that on their divorce the decision in respect of control, and therefore disposition, of their cryopreserved preembryos will be directed by the court. In this area, however, there are few guideposts for decision-making. Advances in medical technology have far outstripped the develop-

ment of legal principles to resolve the inevitable disputes arising out of the new reproductive opportunities now available. For infertile couples, those opportunities may present the only way to have a biological family. Yet, at the point when a husband and wife decide to begin the in vitro fertilization process, they are unlikely to anticipate divorce or to be concerned about the disposition of preembryos on divorce. As they are both contributors of the genetic material comprising the preembryos, the decision should be theirs to make. *See generally Davis v. Davis,* 842 *S.W.*2d 588, 597 (Tenn.1992) (stating that donors should retain decision-making authority with respect to their preembryos), *reh'g granted in part,* 1992 WL 341632, at *1 (Nov. 23, 1992), *and cert. denied, Stowe v. Davis,* 507 *U.S.* 911, 113 *S.Ct.* 1259, 122 *L.Ed.*2d 657 (1993); Carl H. Coleman, *Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes,* 84 *Minn. L.Rev.* 55, 83 (1999) ("Because the embryos are the products of the couple's shared procreative activity, any decision to use them should be the result of the couple's mutual choice."); *cf.* Paul Walter, *His, Hers, or Theirs—Custody, Control, and Contracts: Allocating Decisional Authority Over Frozen Embryos,* 29 *Seton Hall L.Rev.* 937, 959–62 (1999) (discussing approaches to disposition of preembryos, including grant of "sole authority to the biological provider(s)").

But what if, as here, the parties disagree. Without guidance from the Legislature, we must consider a means by which courts can engage in a principled review of the issues presented in such cases in order to achieve a just result. Because the claims before us derive, in part, from concepts found in the Federal Constitution and the Constitution of this State, we begin with those concepts.

## A

Both parties and the ACLU *Amici* invoke the right to privacy in support of their respective positions. More specifically, they claim procreational autonomy as a fundamental attribute of the privacy rights guaranteed by both the Federal and New Jersey Constitu-

tions. Their arguments are based on various opinions of the United States Supreme Court that discuss the right to be free from governmental interference with procreational decisions. See *Eisenstadt v. Baird,* 405 *U.S.* 438, 453, 92 *S.Ct.* 1029, 1038, 31 *L.Ed.*2d 349, 362 (1972); *Griswold v. Connecticut,* 381 *U.S.* 479, 485–86, 85 *S.Ct.* 1678, 1682, 14 *L.Ed.*2d 510, 515–16 (1965); *Skinner v. Oklahoma,* 316 *U.S.* 535, 541, 62 *S.Ct.* 1110, 1113, 86 *L.Ed.* 1655, 1660 (1942).

In *Skinner v. Oklahoma, supra,* the Court spoke of that most "basic liberty[ ]" when rejecting, on equal protection grounds, an Oklahoma statute that required sterilization of certain repeat criminal offenders. 316 *U.S.* at 541, 62 *S.Ct.* at 1113, 86 *L.Ed.* at 1660. "Marriage and procreation," said Justice Douglas, "are fundamental to the very existence and survival of the race." *Ibid.* Later, in *Griswold, supra,* and *Eisenstadt,supra,* the Court invalidated statutes restricting use of and access to contraceptives by both married and unmarried couples, stating in *Griswold* that prohibitions on the use of contraceptives unconstitutionally infringe on the sanctity and privacy of the marital relationship, 381 *U.S.* at 485–86, 85 *S.Ct.* at 1682, 14 *L.Ed.*2d at 515–16, and, in *Eisenstadt,* that "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child," 405 *U.S.* at 453, 92 *S.Ct.* at 1038, 31 *L. Ed.*2d at 362.

This Court also has recognized the fundamental nature of procreational rights. In *In re Baby M,* we considered a custody dispute between a father and a surrogate mother. 109 *N.J.* 396, 537 *A.*2d 1227 (1988). Although the case involved the enforceability of a surrogacy contract, the father asserted that his right to procreate supported his claim for custody of Baby M. *Id.* at 447–48, 537 *A.*2d 1227. We held that the right to procreate was not implicated by the custody battle, which dealt with parental rights after birth. *Ibid.* We observed, however, that "the rights of personal intimacy, of marriage, of sex, of family, of procreation . . .

are fundamental rights protected by both the federal and state Constitutions." *Id.* at 447, 537 *A.*2d 1227; *see also In re Grady,* 85 *N.J.* 235, 247–48, 426 *A.*2d 467 (1981) (recognizing that decisions in *Griswold* and *Eisenstadt* ended "any doubt about a personal right to prevent conception," and holding that "an individual's constitutional right of privacy includes the right to undergo sterilization voluntarily"); *cf. Schroeder v. Perkel,* 87 *N.J.* 53, 66, 432 *A.*2d 834 (1981) (allowing recovery against defendants whose negligent diagnosis deprived mother of right to choose not to conceive child with genetic defect).

Those decisions provide a framework within which disputes over the disposition of preembryos can be resolved. In *Davis, supra,* for example, a divorced couple could not agree on the disposition of their unused, cryopreserved preembryos. 842 *S.W.*2d at 589. The Tennessee Supreme Court balanced the right to procreate of the party seeking to donate the preembryos (the wife), against the right not to procreate of the party seeking destruction of the preembryos (the husband). *Id.* at 603. The court concluded that the husband's right would be significantly affected by unwanted parenthood "with all of its possible financial and psychological consequences." *Ibid.* In his case, that burden was the greater because, as a child, he had been separated from his parents after they divorced and his mother suffered a nervous breakdown. *Id.* at 603–04. Because of his personal experiences, the husband was "vehemently opposed to fathering a child that would not live with both parents." *Id.* at 604.

Against that interest, the court weighed the wife's "burden of knowing that the lengthy IVF procedures she underwent were futile, and that the preembryos to which she contributed genetic material would never become children." *Ibid.* Although that burden was not insignificant, the court found that it did not outweigh the father's interest in avoiding procreation. *Ibid.* The court held that the scales "[o]rdinarily" would tip in favor of the right not to procreate if the opposing party could become a parent through other reasonable means. *Ibid.*

**B**

We agree with the Tennessee Supreme Court that "[o]rdinarily, the party wishing to avoid procreation should prevail." *Ibid.* Here, the Appellate Division succinctly described the "apparent" conflict between J.B. and M.B.:

> In the present case, the wife's right not to become a parent seemingly conflicts with the husband's right to procreate. The conflict, however, is more apparent than real. Recognition and enforcement of the wife's right would not seriously impair the husband's right to procreate. Though his right to procreate using the wife's egg would be terminated, he retains the capacity to father children.
>
> [*J.B., supra,* 331 *N.J.Super.* at 232, 751 *A.*2d 613.]

In other words, M.B.'s right to procreate is not lost if he is denied an opportunity to use or donate the preembryos. M.B. is already a father and is able to become a father to additional children, whether through natural procreation or further in vitro fertilization. In contrast, J.B.'s right not to procreate may be lost through attempted use or through donation of the preembryos. Implantation, if successful, would result in the birth of her biological child and could have life-long emotional and psychological repercussions.[7] See Patricia A. Martin & Martin L. Lagod, *The Human Preembryo, the Progenitors, and the State: Toward a Dynamic Theory of Status, Rights, and Research Policy,* 5 *High Tech. L.J.* 257, 290 (1990) (stating that "[g]enetic ties may form a

---

[7] The legal consequences for J.B. also are unclear. *See N.J.A.C.* 8:2–1.4(a) (stating "the woman giving birth shall be recorded as a parent"). We note without comment that a recent case before the Chancery Division in Bergen County concluded that seventy-two hours must pass before a non-biological surrogate mother may surrender her parental rights and the biological mother's name may be placed on the birth certificate. *A.H.W. v. G.H.B.,* 339 *N.J.Super.* 495, 505, 772 *A.*2d 948 (2000). In Arizona, an appellate court determined that a statute allowing a biological father but not a biological mother to prove paternity violated the Equal Protection Clause. *Soos v. Superior Court,* 182 *Ariz.* 470, 897 *P.*2d 1356, 1361 (1994). In California, the legal mother is the person who "intended to bring about the birth of a child that she intended to raise as her own." *Johnson v. Calvert,* 5 *Cal.*4th 84, 19 *Cal.Rptr.*2d 494, 851 *P.*2d 776, 782 (1993), *cert. denied,* 510 *U.S.* 874, 114 *S.Ct.* 206, 126 *L.Ed.*2d 163, *and cert. dismissed, Baby Boy J. v. Johnson,* 510 *U.S.* 938, 114 *S.Ct.* 374, 126 *L.Ed.*2d 324 (1993).

powerful bond ... even if the progenitor is freed from the legal obligations of parenthood"). Her fundamental right not to procreate is irrevocably extinguished if a surrogate mother bears J.B.'s child. We will not force J.B. to become a biological parent against her will.

## C

The court below "conclude[d] that a contract to procreate is contrary to New Jersey public policy and is unenforceable." 331 *N.J.Super.* at 234, 751 *A.*2d 613. That determination follows the reasoning of the Massachusetts Supreme Judicial Court in *A.Z. v. B.Z.*, wherein an agreement to compel biological parenthood was deemed unenforceable as a matter of public policy. 431 *Mass.* 150, 725 *N.E.*2d 1051, 1057–58 (2000). The Massachusetts court likened enforcement of a contract permitting implantation of preembryos to other contracts to enter into familial relationships that were unenforceable under the laws of Massachusetts, *i.e.*, contracts to marry or to give up a child for adoption prior to the fourth day after birth. *Id.*, 431 *Mass.* 150, 725 *N.E.*2d at 1058. In a similar vein, the court previously had refused to enforce a surrogacy contract without a reasonable waiting period during which the surrogate mother could revoke her consent, and a contract to abandon or to prevent marriage. *Id.*, 431 *Mass.* 150, 725 *N.E.*2d at 1059. Likewise, the court declined to enforce a contract that required an individual to become a parent. *Id.*, 431 *Mass.* 150, 725 *N.E.*2d at 1058.

As the Appellate Division opinion in this case points out, the laws of New Jersey also evince a policy against enforcing private contracts to enter into or terminate familial relationships. 331 *N.J.Super.* at 234–35, 751 *A.*2d 613. New Jersey has, by statute, abolished the cause of action for breach of contract to marry. *N.J.S.A.* 2A:23–1. Private placement adoptions are disfavored, *Sees v. Baber*, 74 *N.J.* 201, 217, 377 *A.*2d 628 (1977), and may be approved over the objection of a parent only if that parent has failed or is unable to perform "the regular and expected

parental functions of care and support of the child." *N.J.S.A.* 9:3–46; *see N.J.S.A.* 9:3–48 (stating statutory requirements for private placement adoption).

That public policy also led this Court to conclude in *Baby M, supra,* that a surrogacy contract was unenforceable. 109 *N.J.* at 433–34, 537 *A.*2d 1227. We held that public policy prohibited a binding agreement to require a surrogate, there the biological mother, to surrender her parental rights. *Id.* at 411, 537 *A.*2d 1227. The contract in *Baby M* provided for a $10,000 payment to the surrogate for her to be artificially inseminated, carry the child to term, and then, after the child's birth, relinquish parental rights to the father and his wife. *Id.* at 411–12, 537 *A.*2d 1227. The surrogate mother initially surrendered the child to the father, but subsequently reconsidered her decision and fled with Baby M. *Id.* at 414–15, 537 *A.*2d 1227. In an action by the father to enforce the surrogacy contract, we held that the contract conflicted with "(1) laws prohibiting the use of money in connection with adoptions; (2) laws requiring proof of parental unfitness or abandonment before termination of parental rights is ordered or an adoption is granted; and (3) laws that make surrender of custody and consent to adoption revocable in private placement adoptions." *Id.* at 423, 537 *A.*2d 1227. Our decision was consistent with the policy expressed earlier in *Sees, supra,* that consent to terminate parental rights was revocable in all but statutorily approved circumstances. 74 *N.J.* at 212, 377 *A.*2d 628.[8]

Enforcement of a contract that would allow the implantation of preembryos at some future date in a case where one party has

---

[8] Currently, a minority of states have passed legislation addressing in vitro fertilization. *See, e.g., Cal.Penal Code* § 367g (West 1999) (permitting use of preembryos only pursuant to written consent form); *Fla. Stat.* ch. 742.17 (1997) (establishing joint decision-making authority regarding disposition of preembryos); *La.Rev.Stat. Ann.* §§ 121–33 (West 1991) (establishing fertilized human ovum as biological human being that cannot be intentionally destroyed); *Okla. Stat. Ann.* tit. 10, § 556 (West 2001) (requiring written consent for embryo transfer); *Tex. Family Code Ann.* § 151.103 (West 1996) (establishing parental rights over child resulting from preembryo).

reconsidered his or her earlier acquiescence raises similar issues. If implantation is successful, that party will have been forced to become a biological parent against his or her will. We note disagreement on the issue both among legal commentators and in the limited caselaw on the subject. *Kass, supra,* held that "[a]greements between progenitors, or gamete donors, regarding disposition of their prezygotes should generally be presumed valid and binding, and enforced in a dispute between them...." 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 180. The New York court emphasized that such agreements would "avoid costly litigation," "minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal private decision." [9] *Ibid.; see also* New York State Task Force on Life and the Law, *Executive Summary of Assisted Reproductive Technologies: Analysis and Recommendations for Public Policy* (last modified Aug. 1999) <http://www.health.state.ny.us/nysdoh/taskfce/execsum.htm> (stating that "[i]ndividuals or couples who have excess embryos no longer desired for assisted reproduction have a strong interest in controlling the fate of those embryos"); John A. Robertson, *Prior Agreements For Disposition of Frozen Embryos,* 51 *Ohio St. L.J.* 407, 409–18 (1990) (arguing that enforcement of advance directives maximizes reproductive freedom, minimizes disputes, and provides certainty to couples and in vitro fertilization programs); Peter E. Malo, *Deciding Custody of Frozen Embryos: Many Eggs Are Frozen But Who Is Chosen?,* 3 *DePaul J. Health Care L.* 307, 332 (2000) (favoring mandatory preembryo disposition agreements). Yet, as discussed above, the Massachusetts Supreme Judicial Court as well as our Appellate Division have declared that when agreements compel procreation over the subsequent objection of one of the parties, those agreements are

---

[9] The Supreme Court of Tennessee, in *dicta,* also stated "that an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors." *Davis, supra,* 842 *S.W.*2d at 597.

violative of public policy. *A.Z., supra,* 725 *N.E.*2d at 1057–58; *J.B., supra,* 331 *N.J.Super.* at 234, 751 *A.*2d 613; *cf.* Coleman, *supra,* 84 *Minn. L.Rev.* at 83–84 (suggesting that party objecting to implantation should prevail against infertile party seeking use of preembryos).

We recognize that persuasive reasons exist for enforcing preembryo disposition agreements. Both the *Kass* and *Davis* decisions pointed out the benefits of enforcing agreements between the parties. *See Kass, supra,* 673 *N.Y.S.*2d 350, 696 *N.E.*2d at 179 (noting "need for clear, consistent principles to guide parties in protecting their interests and resolving their disputes"); *Davis, supra,* 842 *S.W.*2d at 597 (discussing benefit of guidance to parties undertaking in vitro fertilization procedures). We also recognize that in vitro fertilization is in widespread use, and that there is a need for agreements between the participants and the clinics that perform the procedure. We believe that the better rule, and the one we adopt, is to enforce agreements entered into at the time in vitro fertilization is begun, subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored preembryos.

The public policy concerns that underlie limitations on contracts involving family relationships are protected by permitting either party to object at a later date to provisions specifying a disposition of preembryos that that party no longer accepts. Moreover, despite the conditional nature of the disposition provisions, in the large majority of cases the agreements will control, permitting fertility clinics and other like facilities to rely on their terms. Only when a party affirmatively notifies a clinic in writing of a change in intention should the disposition issue be reopened. Principles of fairness dictate that agreements provided by a clinic should be written in plain language, and that a qualified clinic representative should review the terms with the parties prior to execution. Agreements should not be signed in blank, as in *A.Z., supra,* 725 *N.E.*2d at 1057, or in a manner suggesting that the parties have not given ·due consideration to the disposition ques-

tion. Those and other reasonable safeguards should serve to limit later disputes.

█ Finally, if there is disagreement as to disposition because one party has reconsidered his or her earlier decision, the interests of both parties must be evaluated. *See supra* at 25–26, 783 A.2d at 716–17. Because ordinarily the party choosing not to become a biological parent will prevail, we do not anticipate increased litigation as a result of our decision. In this case, after having considered that M.B. is a father and is capable of fathering additional children, we have affirmed J.B.'s right to prevent implantation of the preembryos. We express no opinion in respect of a case in which a party who has become infertile seeks use of stored preembryos against the wishes of his or her partner, noting only that the possibility of adoption also may be a consideration, among others, in the court's assessment.

## IV

Under the judgment of the Appellate Division, the seven remaining preembryos are to be destroyed. It was represented to us at oral argument, however, that J.B. does not object to their continued storage if M.B. wishes to pay any fees associated with that storage. M.B. must inform the trial court forthwith whether he will do so; otherwise, the preembryos are to be destroyed.

The judgment of the Appellate Division is affirmed as modified.

VERNIERO, J., concurring.

I join in the disposition of this case and in all but one aspect of the Court's opinion. I do not agree with the Court's suggestion, in *dicta*, that the right to procreate may depend on adoption as a consideration. *Ante* at 30, 783 A.2d at 720.

I also write to express my view that the same principles that compel the outcome in this case would permit an infertile party to assert his or her right to use a preembryo against the objections of the other party, if such use were the only means of procreation.

In that instance, the balance arguably would weigh in favor of the infertile party absent countervailing factors of greater weight. I do not decide that profound question today, and the Court should not decide it or suggest a result, because it is absent from this case.

Justice ZAZZALI joins in this opinion.

ZAZZALI, J., concurring.

I join in the Court's opinion, except as noted by Justice Verniero's concurring opinion, which I also join. I write separately to note that these difficult disputes all too often prompt dire predictions. And yet, most assuredly, developing technologies will give rise to many more such controversies in the future. The resolution of those controversies depends on the amount of caution, compassion, and common sense we summon up as we balance the competing interests. The significance of those interests underscores the need for continued careful and deliberate decisionmaking, infused with equity, in this developing jurisprudence.

*For Affirmance as Modified* Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI—7.

*Opposed*—None.