COLORADO COURT OF APPEALS                                    **2016COA153**

Court of Appeals No. 15CA0990
Garfield County District Court No. 14DR30080
Honorable John F. Neiley, Judge

In re the Marriage of

Drake F. Rooks,

Appellee,

and

Mandy Rooks,

Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE TERRY
Hawthorne and Fox, JJ., concur

Announced October 20, 2016

James W. Giese, P.C., James W. Giese, Grand Junction, Colorado, for Appellee

Azizpour Donnelly LLC, Katayoun A. Donnelly, Denver, Colorado, for Appellant

¶ 1    This appeal from the permanent orders entered in the dissolution of marriage proceedings between Mandy Rooks (wife) and Drake F. Rooks (husband) presents an issue of first impression in Colorado: how to determine who gets the couple's cryogenically frozen embryos on dissolution of their marriage. (Though the accurate medical term for such unimplanted embryos is "pre-embryos," we will refer to them as "embryos" for simplicity.)

¶ 2    The parties already have three children together. It is undisputed that wife used her last eggs to create the embryos.

¶ 3    Husband and wife agreed in their storage agreement with the fertility clinic that the embryos should be discarded if certain events (inapplicable here) occurred. But if they dissolved their marriage, unless they could agree who would get the embryos, the agreement left it up to the trial court to award them. Wife argued at the permanent orders hearing that the embryos should remain frozen in cryo-storage so that she can have another child in the future, because otherwise she would be infertile. Husband argued that the embryos should be discarded.

¶ 4    In its lengthy, detailed, and carefully reasoned permanent orders, the trial court awarded the embryos to husband. The court

1

relied on two alternative theories derived from the case law of our sister states:

(1) Applying the "contract approach," the court construed the parties' intent as requiring the embryos to be discarded on dissolution of their marriage, unless they could agree otherwise.

(2) Applying the "balancing of interests approach," the court determined that husband's interest in not having more children with wife outweighed wife's interest in having another child.

¶ 5 The court determined that both approaches weighed in favor of awarding the embryos to husband.

¶ 6 Wife appeals from the portion of the permanent orders awarding the embryos. She obtained a stay in the trial court to permit the embryos to remain in cryo-storage pending completion of appellate proceedings. We affirm the trial court's judgment under the balancing of interests approach.

## I. Background

¶ 7 The parties married in 2002, and husband petitioned for dissolution of the marriage in 2014. The major issues decided in this dissolution case concerned property division and the wife's plan to relocate with the parties' children to North Carolina. The

parties spent relatively little time addressing the issues now raised on appeal.

¶ 8 All three of the parties' children were conceived using in vitro fertilization (IVF) techniques, and in that process, six additional embryos were created and placed in cryo-storage. Together with the fertility clinic, the parties signed two agreements pertaining to the embryos: a participation agreement and a storage consent agreement.

¶ 9 The participation agreement advises the parties that they can choose to leave the cryopreserved embryos in storage indefinitely for future use, or they can donate or discard them. The agreement describes the embryos as a "unique form of 'property,'" about which the law is still developing, and alerts the parties that it is important to have a disposition plan for the embryos in case of the parties' death, separation, or divorce.

¶ 10 The storage agreement addresses disposition of the cryopreserved embryos in the event of dissolution of the parties' marriage or a party's death.

## II.  Colorado Law

¶ 11    The Colorado General Assembly has determined that embryos are not "persons" and therefore are also not "children."  *See* § 13-21-1204, C.R.S. 2016 (construing Civil Remedy for Unlawful Termination of Pregnancy Act as not "confer[ring] the status of 'person' upon a human embryo"); § 18-3.5-110, C.R.S. 2016 (similarly construing Offenses Against Pregnant Women statutes); *see also* Deborah L. Forman, *Embryo Disposition, Divorce & Family Law Contracting: A Model for Enforceability*, 24 Colum. J. Gender & L. 378, 423 (2013) ("All appellate decisions to date have rejected the notion that embryos are 'children' under the law . . . .").

¶ 12    The Uniform Parentage Act (UPA) provides that a former spouse will not be a parent of any child born as a result of the placement of embryos through assisted reproduction *after dissolution of marriage* unless the former spouse consents to be a parent.  *See* § 19-4-106(7)(a), C.R.S. 2016.  The Colorado Probate Code provides that such a child will not be considered a former spouse's child, unless the former spouse gives consent to that effect and the consent is specific to assisted reproduction occurring after divorce.  *See* § 15-11-120(9), C.R.S. 2016.  Under the UPA, a former

spouse may withdraw consent to placement of embryos "at any time" before they are placed. § 19-4-106(7)(b); *see also* § 15-11-120(10).

¶ 13    Because there is no Colorado statute or appellate decision addressing the specific issue raised here, namely, the disposition of cryopreserved embryos on dissolution of marriage, *see* Suzanne Griffiths & Logan Martin, *Assisted Reproduction and Colorado Law: Unanswered Questions and Future Challenges*, 35 Colo. Law. 39 (Nov. 2006), we look to other jurisdictions that have addressed the issue. *See P.W. v. Children's Hosp. Colo.*, 2016 CO 6, ¶ 23 ("With no Colorado case directly on point, we look to the decisions of other jurisdictions for persuasive guidance.").

### III.  Other Jurisdictions

¶ 14    Courts in other jurisdictions have adopted three different approaches for determining the disposition of divorcing spouses' cryopreserved embryos: the contract approach, the balancing of interests approach, and the contemporaneous mutual consent approach. *See Szafranski v. Dunston*, 993 N.E.2d 502, 506 (Ill. App. Ct. 2013) (*Szafranski I*); *see also* Michael T. Flannery, *"Rethinking" Embryo Disposition Upon Divorce*, 29 J. Contemp.

5

Health L. & Pol'y 233, 237-38 (2013); Forman, 24 Colum. J. Gender & L. at 383-86.

## A. The Contract Approach

¶ 15    Under the contract approach, an agreement between spouses that was entered into when the embryos were created and cryo-stored will be enforced as to the disposition of the embryos on dissolution of marriage. *See Davis v. Davis*, 842 S.W.2d 588, 597 (Tenn. 1992). In *Davis*, the divorcing spouses had agreed on all terms relating to the dissolution of their marriage except one: who was to have "custody" of their seven cryopreserved embryos held in storage at a fertility clinic. *Id.* at 589. The Tennessee court held that, "as a starting point" in resolving such a dispute, an agreement regarding disposition of the embryos in the event of divorce "should be presumed valid and should be enforced as between the progenitors." *Id.* at 597.

¶ 16    Other states have since followed Tennessee's lead and have ruled, citing *Davis*, that agreements between spouses that are entered into at the time of IVF are enforceable with respect to any agreed-upon disposition of cryopreserved embryos on dissolution of marriage. *See Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998); *In re*

*Marriage of Dahl,* 194 P.3d 834, 840 (Or. Ct. App. 2008); *Roman v. Roman,* 193 S.W.3d 40, 50 (Tex. App. 2006); *but see A.Z. v. B.Z.,* 725 N.E.2d 1051, 1053-59 (Mass. 2000) (refusing to enforce parties' agreement that if they separated, the wife, who had already given birth to two children using the parties' embryos, would receive their remaining embryos for implantation).

¶ 17    Advantages of the contract approach, as the New York court observed in *Kass,* are that it "reserv[es] to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision"; it avoids litigation in "personal matters of reproductive choice"; and it "provide[s] the certainty needed for effective operation of IVF programs."  696 N.E.2d at 180; *see also Szafranski I,* 993 N.E.2d at 515; *Roman,* 193 S.W.3d at 50.

## B.  The Balancing of Interests Approach

¶ 18    Though the Tennessee Supreme Court in *Davis* endorsed a contract approach, it was unable to use that approach to guide its decision because the spouses had not entered into an agreement regarding disposition of their embryos.  This led the court to use a balancing of interests approach, and it ultimately weighed the husband's interest in avoiding procreation more heavily than the

wife's interest in wanting to donate the embryos to another couple. *Davis*, 842 S.W.2d at 598, 603-04.

¶ 19 Other courts have also held that, when the parties have not agreed as to who should receive cryopreserved embryos on dissolution of marriage, the trial court must balance the parties' interests to resolve the issue. *See J.B. v. M.B.*, 783 A.2d 707, 713-14, 719-20 (N.J. 2001); *Reber v. Reiss*, 42 A.3d 1131, 1136 (Pa. Super. Ct. 2012).

¶ 20 In applying this approach, the *Davis* court said, "[o]rdinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the []embryos in question." 842 S.W.2d at 604; *accord Szafranski I*, 993 N.E.2d at 514-15; *see also Szafranski v. Dunston*, 34 N.E.3d 1132, 1161-64 (Ill. App. Ct. 2015) (*Szafranski II*) (upholding lower court's ruling that the interests of a woman, who had embryos created with a male friend before undergoing chemotherapy, were paramount because she had no other option for having a biological child); *J.B.*, 783 A.2d at 719-20 (ruling in favor of the wife's interest to avoid procreation after considering that the husband was already a father and was capable

of fathering other children); *Reber*, 42 A.3d at 1132-43 (upholding ruling in favor of forty-four-year-old wife, who had no children and had undergone IVF before cancer treatment in order to preserve her ability to conceive a child).

### C. The Contemporaneous Mutual Consent Approach

¶ 21 Iowa employs a contemporaneous mutual consent approach. There, if the parties have not previously agreed how to allocate their cryopreserved embryos on dissolution of marriage, the dissolution court will not allocate them. Instead, the embryos are left in storage indefinitely until the parties can agree as to their disposition. *In re Marriage of Witten*, 672 N.W.2d 768, 783 (Iowa 2003); *see Szafranski I*, 993 N.E.2d at 510-11.

¶ 22 The Iowa court rejected the contract approach, reasoning that judicial enforcement of an embryo disposition agreement "in this highly personal area of reproductive choice" would be against public policy. *Witten*, 672 N.W.2d at 781. The court also noted its "grave public policy concerns" with the balancing test, which "substitute[s] the courts as decision makers in this highly emotional and personal area." *Id.* at 779, 783.

¶ 23    The Iowa court's approach has been criticized as being "totally unrealistic," because if the parties had any ability to reach an agreement on disposition of their embryos, they would not need a court's ruling. *Reber*, 42 A.3d at 1135 n.5; *see Szafranski I*, 993 N.E.2d at 511. As the trial court aptly noted in rejecting the Iowa approach in this case, it "essentially gives one party a *de facto* veto over the other party" because the issue will inevitably be determined by the passage of time. *See Szafranski I*, 993 N.E.2d at 512 (noting that Iowa's approach may provide a bargaining chip for an ex-spouse to effectively hold embryos hostage to punish the other ex-spouse or to gain other advantages). We join the *Reber* and *Szafranski* courts in rejecting the contemporaneous mutual consent approach.

IV.  Application of the Contract and Balancing Approaches

¶ 24    We concur with those courts that have adopted the contract approach and have enforced a valid agreement entered into between the spouses as to disposition of the embryos on dissolution of marriage. We are also in accord that, where there is no such agreement between the parties, a balancing of interests approach should be taken.

## A. The Trial Court's Application of the Contract Approach

¶ 25 As argued by wife on appeal, the contract approach has two components: an oral agreement between her and husband, and the written storage agreement.

¶ 26 Wife's appellate briefs argue that the trial court erred by failing to enforce an alleged oral agreement between the parties that she could have a total of four children using the embryos. Because wife did not raise this issue in the district court and did not obtain a ruling on it, we do not address it. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992) ("Arguments never presented to, considered [by,] or ruled upon by a trial court may not be raised for the first time on appeal."). And because the record does not show that she preserved her related promissory estoppel argument, we will not address that argument, either. *See id.*

¶ 27 We agree, however, with wife's contention that the trial court erred in interpreting the written storage agreement.

¶ 28 We review de novo the trial court's interpretation of the parties' written storage agreement, including the court's determination that the agreement is ambiguous. *See Ad Two, Inc. v. City & Cty. of*

11

*Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376-77 (Colo. 2000); *In re Marriage of Crowder*, 77 P.3d 858, 860 (Colo. App. 2003).

¶ 29 The goal in interpreting the agreement is to give effect to the parties' intent as discerned from the contract language. *Ad Two*, 9 P.3d at 376; *Crowder*, 77 P.3d at 860-61. Extraneous evidence of such intent may be considered only if the written agreement is ambiguous, meaning that it is fairly susceptible of more than one reasonable interpretation. *Ad Two*, 9 P.3d at 376-77; *Crowder*, 77 P.3d at 861.

¶ 30 A court may not rewrite an agreement under the guise of interpreting it. *See Bledsoe Land Co. v. Forest Oil Corp.*, 277 P.3d 838, 842 (Colo. App. 2011); *see also In re Marriage of Stokes*, 43 Colo. App. 461, 466, 608 P.2d 824, 829 (1979) ("Courts cannot rewrite contracts or add terms thereto.").

¶ 31 We conclude that the storage agreement leaves it to the dissolution court to decide which party should receive the embryos in the event of dissolution of their marriage.

¶ 32 The pertinent language is as follows:

> In the event of divorce or dissolution of our marriage, we acknowledge that the disposition

of our embryos will be part of the divorce/dissolution decree paperwork.

. . . [I]f any court of competent jurisdiction award[s] to either Husband or Wife all rights with respect to the Cryopreserved embryos to the exclusion of the other spouse, by an order or decree which is final and binding to them, the [laboratory] shall have the right to deal exclusively with him or her to whom such rights were awarded (the prevailing party) . . . .

In the event that the divorce/dissolution decree paperwork does not address the disposition of the embryo(s), we elect the following disposition of our embryo(s):

. . . .

[Parties' initials] Thawed and discarded without undergoing any further development for any purpose.

¶ 33 Both husband and wife initialed the above-quoted "thawed and discarded" option, and one of them apparently underlined the word "discarded."

¶ 34 We construe this contract provision to mean:

1. The parties elected a default option of discarding the embryos *if* they did not make any other provision for the embryos in a stipulation in their dissolution proceeding *and if* the dissolution court did not rule on the issue.

13

2. In their dissolution proceeding, the parties could stipulate to a disposition *other than* discarding the embryos.

3. If the parties disagreed about the disposition of the embryos in their dissolution proceeding and sought a ruling from the dissolution court on the issue, that court would decide which party would be awarded the embryos.

¶ 35     The trial court found that the contract was ambiguous as to how the court should award the embryos in the event of dissolution. It resolved the ambiguity by construing the agreement to require *both* parties' mutual agreement before any of the embryos could be thawed and implanted, and it therefore ruled that absent such an agreement, the embryos would be thawed and discarded on dissolution of the parties' marriage. According to the court, "[t]he fact that the parties agreed to mutually approve any reproductive transfer or use of the embryos is a strong indication of their intent that [wife] should not now be awarded that exclusive right in the event of divorce."

¶ 36     We conclude that the court erred in attempting to infer contract terms that did not exist. The contract gives no guidance as to how the court is to make the decision regarding who will be

14

awarded control over the embryos in the event of divorce if the parties disagree on the issue. The contract approach employed by other courts could not be used because there was no agreement that could be enforced as to who should receive the embryos.

¶ 37    Given the absence of enforceable contract terms on the issue, we construe the contract as requiring the dissolution court to exercise its inherent equitable power to determine whom to award the embryos to if the parties cannot agree on that point. *See In re Marriage of Balanson*, 25 P.3d 28, 35 (Colo. 2001) (noting trial court's role in ordering equitable distribution of marital property based upon facts and circumstances of an individual case); *see also Szafranski II*, 34 N.E.3d at 1161; *J.B.*, 783 A.2d at 713-19 (where a contract did not manifest a clear intent by the parties regarding disposition of their embryos on dissolution of their marriage, but instead permitted them to obtain a court order directing such disposition, "the interests of both parties must be evaluated" by the court); *Reber*, 42 A.3d at 1136; *Davis*, 842 S.W.2d at 604; *but cf. Roman*, 193 S.W.3d at 52-54 (the parties were well aware of other options when they chose the option to have embryos destroyed in the event of divorce).

15

¶ 38   Because the court had to rely on its equitable discretion to determine how to award the embryos, it necessarily had to employ the balancing approach. *See Davis*, 842 S.W.2d at 598, 603-04 (using balancing approach where spouses had not agreed on disposition of embryos in event of divorce).

B.  The Trial Court's Application of the Balancing Approach

¶ 39   Given that there was no enforceable agreement between the parties as to disposition of the embryos on dissolution, the court was required to balance the parties' interests.  We reject wife's contention that the trial court erred in doing so.

¶ 40   Application of the balancing test is an exercise of the trial court's equitable discretion, and we therefore review its decision for an abuse of discretion.  *See Balanson*, 25 P.3d at 35 (trial court has great latitude to effect an equitable distribution of marital property based on facts and circumstances of each case, and an appellate court will not disturb a trial court's decision absent a clear abuse of discretion); *Szafranski II*, 34 N.E.3d at 1161-62 (balancing of interests approach involves "a fact-intensive inquiry into each party's interest in using or preventing the use of the []embryos"); *cf. In re Marriage of Ciesluk*, 113 P.3d 135, 142, 147-48 (Colo. 2005) (in

parental relocation case, conducting abuse of discretion review of trial court's balancing of child's best interests with relocating parent's constitutional right to travel and other parent's constitutional right to parent).

¶ 41 Wife argues that some of the factors the trial court applied in its balancing approach are legally erroneous and that others violate her constitutional rights. We conclude that the trial court properly exercised its discretion in balancing the parties' competing interests in the embryos and in deciding to award them to husband.

1. Wife's Interest in Having a Fourth Child

¶ 42 As previously discussed, we do not address wife's contention that she had a binding agreement with husband to have four children because she failed to preserve that issue for appeal.

¶ 43 Nevertheless, she argues that the court was required to balance her desire to have another child with husband's desire not to father additional children with her. We conclude that the court appropriately balanced the parties' competing interests.

¶ 44 Given that wife has already borne three children, this is not a situation like *Davis*, 842 S.W.2d at 591-92, *Szafranski I*, 993 N.E.2d at 503-05, or *Reber*, 42 A.3d at 1132-33, where the woman's

17

only opportunity to bear children would be foreclosed if the court did not award the embryos to her. *See J.B.*, 783 A.2d at 717 (considering, when balancing parties' interests, that the husband was already a father); *cf. A.Z.*, 725 N.E.2d at 1053-55, 1057-59 (upholding lower court's refusal to enforce contract allowing the wife, who had already conceived and given birth to twins during the marriage, to implant the parties' four remaining cryopreserved embryos on the parties' separation).

¶ 45    Accordingly, under the balancing of interests approach, the court could reasonably conclude that husband's interest in not producing additional offspring prevails over wife's interest in having a fourth child. *See Davis*, 842 S.W.2d at 603-04; *see also Szafranski I*, 993 N.E.2d at 515; *J.B.*, 783 A.2d at 719-20; *but cf. Szafranski II*, 34 N.E.3d at 1162-63 (upholding ruling that childless woman's interest in using embryos she created with friend before she underwent fertility-destroying chemotherapy was paramount over friend's interest in not procreating); *Reber*, 42 A.3d at 1140-42 (holding that balancing of interests tipped in favor of the wife because the embryos were "likely her only chance at genetic parenthood").

¶ 46    The court appropriately considered husband's emotional and psychological well-being, in that he would likely feel a moral and social obligation for a fourth biological child, even though he may have no legal obligation to the child. This finding further supports the court's allocation of the embryos to husband under the balancing of interests approach. *See J.B.*, 783 A.2d at 717 (noting "life-long emotional and psychological repercussions" for the wife if her biological child is born in the future to the husband and a surrogate mother).

### 2. Financial Responsibility for Additional Children Born of the Embryos

¶ 47    Wife next argues that the trial court erred as a matter of law by considering the potential risk that husband could face financial obligations for a child born in the future using the embryos. We are not persuaded.

¶ 48    The court noted that wife declared her intention to relocate to North Carolina, and that the court allocated parental responsibilities to allow the parties' three children to move there with her. According to the court, North Carolina does not have statutory provisions, such as Colorado's sections 19-4-106(7) and

19

15-11-120(10), that would relieve husband of financial responsibility for a future child born using the embryos without his consent.

¶ 49 To the extent wife further argues that the trial court erred by considering the potential increase in husband's child support obligation for the parties' existing children if wife chooses to have a fourth child, we discern no abuse of discretion by the court in considering this factor. We disagree that, in doing so, the court impermissibly implied that wife should not have another child. Rather, the court merely noted an inevitable financial consequence for husband if wife chooses to have another child using the embryos — an appropriate consideration when balancing the parties' interests.

### 3. Wife's Constitutional Arguments

¶ 50 Wife relies on various provisions of the constitutions of the United States and Colorado to raise numerous challenges to the trial court's balancing of interests. She contends that she was not required to take specific action to preserve those arguments in the trial court because they arose from the trial court's various comments in its permanent orders. We agree that her arguments

are sufficiently preserved, but we disagree that her constitutional rights were violated by the permanent orders.

¶ 51     To the extent that the Colorado Constitution may have provisions different from those of the United States Constitution, wife has not identified any different analysis that would be required under the state constitution.  We therefore confine our analysis to the United States Constitution's provisions.  *See Holliday v. Reg'l Transp. Dist.*, 43 P.3d 676, 681 (Colo. App. 2001).

¶ 52     Wife asserts that the following rights were violated, and that these rights derive from the United States Constitution:

- the right to equal protection of the law;

- the right to due process;

- the right to "procreational autonomy";

- the right of privacy;

- the "freedom of choice in procreation"; and

- the "fundamental liberty interest in the care, custody, and management of her children."

¶ 53     We begin by recognizing that for every one of the rights identified by wife, husband has corresponding and equal rights, including the right to determine that he does not want to have

21

additional children who are joint genetic offspring of husband and wife. *See Davis*, 842 S.W.2d at 601 (noting that "right of procreational autonomy is composed of two rights of equal significance — the right to procreate and the right to avoid procreation"); Forman, 24 Colum. J. Gender & L. at 425 ("[B]oth parties have constitutional procreation rights at stake.").

¶ 54　　Wife argues that husband would have no future financial responsibility for any additional children born from the embryos. Even if she were correct about that — and it is not entirely clear under the law of North Carolina where she now lives whether that is so — it is nevertheless true that father would in fact (though not in law) be the father of any such children. And any such children would be the siblings of father's three existing children, and would be part of their lives.

¶ 55　　The trial court's task, then, was to balance all of those competing rights of wife and husband and come to a difficult, discretionary decision. We conclude that, in reaching that decision, it did not violate wife's constitutional rights.

¶ 56　　Specifically, it was not a violation of her constitutional rights for the trial court to discuss the following matters in its final orders:

- The fact that wife already has three children.  As other courts applying the balancing approach have recognized, it may weigh in a party's favor if preserving the embryos would provide a party's only chance to create genetic offspring.  *See Szafranski II*, 34 N.E.3d at 1161-64 (considering woman's infertility in weighing competing interest of male friend who no longer wanted to procreate); *Reber*, 42 A.3d at 1132-43 (ruling that interests of divorcing wife, who was forty-four, had no children, and had undergone IVF before cancer treatment in order to preserve her ability to conceive a child, prevailed over those of the husband); *cf. J.B.*, 783 A.2d at 719-20 (ruling that divorcing wife's interest in avoiding procreation outweighed the husband's where he was already a father and was capable of fathering other children).

- What would happen if wife had another child (or children) from the embryos.  The court noted that if she were to have more children, she would get a credit on any child support worksheet, which would indirectly increase the

amount of child support owed by husband to wife.  Given that husband's constitutional rights in not having additional children were implicated by the court's decision, we see no abuse of discretion in the court's consideration of the potential economic impact on the parties.

- How the addition of another child (or children) might affect the parties' existing children, and whether such an addition might challenge wife's ability to "manage such a large family alone as a single parent," given her lack of employment and financial resources, and the significant health issues faced by one of the children.  The court remarked on those circumstances as part of its ruminations on how the parties might fare in the future. We see no constitutional impediment to the court's discussion of the practicalities of wife's situation. Contrary to her assertions on appeal, there is no indication that the court ruled in favor of husband based on improper considerations, i.e., because wife is poor.  It is clear to us that the court did not base its decision on

wife's economic or social circumstances. Rather, it carefully balanced the parties' competing interests.

¶ 57 Though wife argues that the trial court improperly injected a "best interest of the child" test in the final orders, we find no instance where the court applied such a test. The court merely mentioned the potential impacts of various factual circumstances on the parties' existing children, and we discern no constitutional violation or abuse of its discretion in doing so.

¶ 58 Wife cites *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942), which dealt with involuntary sterilization of persons convicted of certain felonies, and argues that "the court may not dictate to American citizens the number of children they may have." To the extent that the permanent orders may *result* in a limitation on the number of children wife may ultimately wind up bearing through biological means, that is simply a consequence of the parties' having left it up to the court to decide who gets the remaining embryos. Wife could have contracted to receive the embryos on dissolution of the marriage, but did not do so, and instead requested in her supplemental trial brief that the court decide the issue based on a balancing of the parties' interests.

¶ 59     By leaving such an important decision up to the court, the parties should have expected the court to thoroughly examine the parties' desires, life circumstances, and financial state, as it does in balancing the interests in every permanent orders case. *See Balanson*, 25 P.3d at 35.

¶ 60     We reject wife's unsupported argument that husband relinquished his constitutional right not to procreate by consenting to the use of his sperm to fertilize wife's "last eggs." The storage agreement contradicts this theory by specifically providing for allocation of the embryos on dissolution to be decided in the "divorce/dissolution decree paperwork." Moreover, the UPA expressly allows husband, as a former spouse, to withdraw his consent for placement of the embryos "at any time" before they are placed. § 19-4-106(7)(b).

¶ 61     Wife and husband have equal claim to constitutional and other rights. The decision allocating the embryos required the court to balance those competing interests, and the court did so appropriately.

¶ 62     Accordingly, we perceive no constitutional violation. *See Szafranski I*, 993 N.E.2d at 516 (finding no constitutional obstacle

to contract or balancing of interests approach because friend who participated in creating embryos did not have unilateral constitutional right to prohibit their use without regard to the woman's equal rights); *see also Szafranski II,* 34 N.E.3d at 1163-64.

## V. Conclusion

¶ 63 The trial court's judgment awarding the parties' embryos to husband under the balancing of interests approach is affirmed.

JUDGE HAWTHORNE and JUDGE FOX concur.