The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 23, 2019

**2019COA80**

**No. 17CA2318, *In re Marriage of Olsen* — Family Law — Dissolution — Parents and Children — Assisted Reproduction — Embryos**

A division of the court of appeals considers the disposition of a divorced couple's cryogenically frozen pre-embryos under the guidance of *In re Marriage of Rooks*, 2018 CO 85.  The division concludes that wife's subjective belief that the pre-embryos should be protected as human life should not be weighted more heavily than husband's constitutional interest in not procreating using the pre-embryos.  Consequently, the division remands to the district court to rebalance the parties' interests in accord with *Rooks*.

Court of Appeals No. 17CA2318
El Paso County District Court No. 12DR5458
Honorable Timothy Schutz, Judge

In re the Marriage of

Jamie R. Fabos, f/k/a Jamie R. Olsen,

Appellee,

and

Justin R. Olsen,

Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE RICHMAN
Navarro and Welling, JJ., concur

Announced May 23, 2019

Theresa Sidebotham, Monument, Colorado; Joan M. Mannix, Chicago, Illinois, for Appellee

Paige Mackey Murray, LLC, Paige Mackey Murray, Boulder, Colorado, for Appellant

¶ 1    In this dissolution of marriage proceeding, we are called upon, as was the division in *In re Marriage of Rooks*, 2016 COA 153 (*Rooks I*), *rev'd*, 2018 CO 85 (*Rooks II*), to review a district court's disposition of a divorcing couple's cryogenically frozen pre-embryos.

## I.  Background and Procedural History

¶ 2    Similar to the couple in *Rooks*, the divorcing couple here, Jamie R. Fabos, formerly known as Jamie R. Olsen (wife), and Justin R. Olsen (husband), sought in vitro fertilization (IVF) during their marriage after they were unable to conceive otherwise.  Four of wife's eggs were fertilized; two of the resulting pre-embryos were implanted successfully, leading to the births of the parties' twins in 2011; and the remaining two pre-embryos were cryogenically frozen for possible future use.

¶ 3    Also similar to the situation in *Rooks*, although the parties had entered into an agreement with the fertility center where they underwent IVF — entitled "Informed Consent for Assisted Reproduction" — that agreement did not specify a disposition of their remaining pre-embryos if they divorced.  Rather, it provided, as did the agreement in *Rooks*, that in the event of divorce

1

ownership of the pre-embryos would be "as directed by court decree and/or settlement agreement." *See Rooks II*, ¶¶ 2, 13, 73.

¶ 4    But the agreement provided an option for the parties to elect a disposition for their pre-embryos in the event of death or incapacitation of both of them, as well as when wife reached age fifty-five. Unlike in *Rooks*, where the couple agreed that in the event of the wife's death, or the death of both partners, the embryos would be "thawed and discarded," *see id.* at ¶ 12, here for both of these scenarios, wife and husband initialed the option to donate the pre-embryos to another couple. They did not initial the other available options: to "thaw and discard" the pre-embryos or "donate the pre-embryo(s) for research."

¶ 5    In 2012, wife petitioned for dissolution of marriage. A decree was entered in 2013 resolving all dissolution issues except for the disposition of the pre-embryos, which was reserved for further proceedings.

¶ 6    It is at this point where the facts of this case diverge materially from those in *Rooks*. Mrs. Rooks asked the divorce court to award the pre-embryos to her because she wanted to preserve them for future implantation so that she could have more children, whereas

2

Mr. Rooks wanted to thaw and discard them. *Id.* at ¶ 14. In this case, however, wife does not want more children and instead wants to donate the pre-embryos to another infertile couple, whereas husband wants to discard them.

¶ 7 After a hearing, the district court, in a lengthy, thoughtful, and detailed order, first determined that the parties did not have an agreement on the disposition of their remaining pre-embryos in the event they divorced. Thus, consistent with this court's decision in *Rooks I*, ¶ 24, the district court engaged in a balancing of the parties' interests, concluding that the pre-embryos should be awarded to wife so that she could donate them to another couple.[1]

¶ 8 Husband appeals the district court's judgment, contending that the court erred in balancing the parties' interests.[2] The district

_____

[1] The district court conditioned the donation on wife's arranging that any donee couple "waive any right to seek contact with [husband], whether for genetic testing or any other purpose."

[2] Husband initially challenged the district court's use of the balancing of interests test and argued it should have applied a different standard — contemporaneous mutual consent. However, he abandoned that argument after *Rooks II* was announced and the supreme court adopted the balancing of interests test as the appropriate test to use in dissolution of marriage cases when there is no agreement as to the disposition of pre-embryos on divorce. *See In re Marriage of Rooks*, 2018 CO 85, ¶ 33 (*Rooks II*).

court granted husband's request to stay its decision and ordered the parties to share equally the cost of maintaining the pre-embryos in cryogenic storage pending resolution of husband's appeal.

¶ 9    Because the supreme court announced *Rooks II* while this appeal was pending, we requested supplemental briefs addressing that decision. Considering the parties' initial and supplemental briefs and their oral arguments, we reverse the district court's judgment and remand the case for further proceedings. In doing so, we first address the framework established in *Rooks II* for resolving disagreements over the disposition of pre-embryos in the event of divorce. We then address husband's contentions under that framework, thereby resolving several issues not arising in, and thus not resolved by, *Rooks II.*

## II. *Rooks* and the Balancing of Interests Approach

¶ 10    In *Rooks II*, ¶¶ 32, 49-55, the supreme court noted that Colorado law relevant to assisted reproduction is not helpful in resolving disputes between divorcing parties concerning the disposition of their cryogenically frozen pre-embryos. The court further considered the three methods that have been used in other jurisdictions for resolving such disputes: the contract approach, the

4

balancing of interests approach, and the contemporaneous mutual consent approach. *Id.* at ¶¶ 40-48.

¶ 11    It rejected the contemporaneous mutual consent approach, which essentially maintains the status quo by leaving the pre-embryos in storage indefinitely until and unless the parties agree otherwise.[3]  The court noted, among other bases for rejecting this approach, that it gives one party a de facto veto over the issue and abdicates the court's responsibility to resolve an issue on which the parties have proven unable to agree.  *Id.* at ¶¶ 45, 60.

¶ 12    The court held that, instead, a dissolution court must first look to any existing agreement between the parties as to disposition of their pre-embryos in the event of divorce.  *Id.* at ¶¶ 61, 74.  The court agreed with other jurisdictions applying a contract approach that if there is such an agreement the court must enforce it, thereby allowing the parties, as progenitors, and not the court, to decide the private, personal matter of what will happen to their pre-embryos. *See id.* at ¶¶ 63, 72.  When there is no express agreement on the

---

[3] Justice Hood, joined by two members of the court, dissented in *Rooks II*, arguing for adoption of the contemporaneous mutual consent approach.  *See Rooks II*, ¶¶ 82-107.

disposition of the pre-embryos in the event of a divorce, however, the court should apply a balancing of interests approach to determine the issue. *Id.* at ¶¶ 33, 64, 72, 74.

¶ 13 The *Rooks II* court provided "a non-exhaustive list" of factors that the court should consider in balancing the parties' interests:

- the intended use of the disputed pre-embryos by the party who seeks to preserve them;

- the demonstrated physical ability or inability of the party seeking to preserve the pre-embryos to have biological children through other means;

- the parties' original reasons for undergoing IVF — for example, to preserve a party's future ability to have biological children in the face of potential fertility loss due to medical treatment;

- the hardship for the party seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations;

- either party's demonstrated bad faith or attempt to use the pre-embryos as leverage in the dissolution proceedings; and

- other relevant factors based on the circumstances of the case.

*Id.* at ¶¶ 65-71, 74.

¶ 14    The supreme court also listed certain other factors that courts must not consider in a balancing test: economic considerations such as whether the party seeking to become a genetic parent can afford to have another child, whether that party could instead adopt or otherwise parent nonbiological children, and the sheer number of a party's existing children.  *Id.* at ¶¶ 71, 74.  Because the division of our court in *Rooks I* had upheld a district court's disposition that relied in part on these prohibited factors, the supreme court in *Rooks II* reversed that decision and remanded the case for the district court to rebalance the parties' interests under the framework it adopted.  *Id.* at ¶¶ 5, 73.

¶ 15    Although the district court in the present case did not have the benefit of the decision of the supreme court in *Rooks II*, it did apply a balancing test using pertinent factors.  The district court identified seven specific factors to be balanced, and, although phrased differently than the supreme court's list of factors in *Rooks II,* the pertinent factors applied by the district court are sufficiently similar to the *Rooks II* factors that we will not reverse the district court ruling solely because its phraseology differed.

III.  Husband's Appeal

7

¶ 16    Husband contends that the district court erred in applying the balancing of interests test because it weighted wife's interest in donating the pre-embryos more heavily than his interest in avoiding procreation based on wife's moral belief that the pre-embryos are human lives.  We agree and thus reverse the judgment and remand the case for the district court to rebalance the parties' interests consistent with this opinion and *Rooks II.*

## A.  Standard of Review

¶ 17    The parties disagree regarding the standard of review we should apply in reviewing the district court's decision.  Husband argues that a de novo standard applies because the case involves constitutionally protected interests.  Wife argues that application of a balancing of interests test is necessarily an exercise of the district court's equitable discretion and therefore an abuse of discretion standard applies.

¶ 18    The supreme court in *Rooks II* granted certiorari in part to address "[w]hether the court of appeals erred in applying an abuse of discretion standard of review in reviewing the trial court's determination of the disposition of a couple's cryogenically frozen

pre-embryos in a dissolution of marriage." *Id.* at ¶ 3 n.1. But, the court did not resolve this issue.

¶ 19     The court did, however, characterize the pre-embryos as marital property, albeit "marital property of a special character" because they "contain the potential for human life." *Id.* at ¶ 57. And it noted the district court's discretion under section 14-10-113(1), C.R.S. 2018, and *In re Marriage of Balanson*, 25 P.3d 28, 35 (Colo. 2001), to divide marital property equitably after considering relevant factors. *Rooks II*, ¶¶ 58, 72. These statements imply that an abuse of discretion standard applies as it would in reviewing any marital property distribution. *See Balanson*, 25 P.3d at 35 (recognizing district court's "great latitude" to equitably distribute marital property and that an appellate court must not disturb its decision "unless there has been a clear abuse of discretion").

¶ 20     Additionally, the supreme court has previously applied an abuse of discretion standard of review to an issue involving competing constitutional rights. *See In re Marriage of Ciesluk*, 113 P.3d 135, 142, 148 (Colo. 2005). In *Ciesluk*, the court reviewed a parental relocation determination under section 14-10-129(2)(c),

C.R.S. 2018, for an abuse of discretion, noting that the determination involved balancing the mother's constitutional right to travel between states against the father's constitutional right to parent his child. *Ciesluk*, 113 P.3d at 142, 148.

¶ 21    Thus, we apply an abuse of discretion standard. In doing so, however, we more carefully scrutinize the district court's determination because it involves the parties' constitutional rights. *See Nikander v. Dist. Court*, 711 P.2d 1260, 1262 (Colo. 1986).

B. The District Court's Balancing of Interests Analysis

¶ 22    The district court began its analysis with three "constructs" that had informed its balancing analysis: (1) the pre-embryos are not legally considered human lives; (2) neither party can persuasively argue that he or she would involuntarily become a parent, legally or financially, of any child born using the pre-embryos; and (3) the parties' competing interests are grounded in constitutional rights — the right to procreate and the right not to procreate. These constructs are consistent with *Rooks II*, ¶¶ 35-39, 50-57.

¶ 23    Against this backdrop, the court then weighted the parties'
interests, applying the factors listed in the division's decision in
*Rooks I*, ¶¶ 42-62, to the extent they were pertinent to this case.

¶ 24    Husband contends only two of the supreme court's *Rooks II*
balancing factors are relevant to the circumstances here: wife's
intended use of the embryos and the hardship on him if he were
forced to become a genetic parent. *See Rooks II*, ¶¶ 66, 69. Wife
did not want to have more children herself using the pre-embryos
so her physical ability to have more children through other means
is not relevant. Also, the parties did not have a reason for
undergoing IVF other than to have children, which they
successfully did. Further, neither party argued in the district court
that the other was acting in bad faith or using the pre-embryos as
unfair leverage in the divorce proceedings, as all other dissolution
issues had been resolved. The district court also did not consider
any of the *Rooks II* prohibited factors. *See id.* at ¶ 71.

¶ 25    Applying the first factor (intended use of the pre-embryos by
the party who seeks to preserve them), the court stated that wife's
interest in donating the pre-embryos was "less important" than her
interest would be if she planned to use the embryos to have another

11

child herself. But it still weighted this factor "slightly" in wife's favor because it concluded "she is seeking to utilize the embryos for a productive purpose rather than simply discard them as [husband] proposes."

¶ 26 The court weighted the factor of "hardship for the party seeking to avoid becoming a genetic parent" "slightly" in husband's favor, and it weighted wife's personal view that the pre-embryos are human lives "heavily" in her favor.

¶ 27 Separately, the district court ultimately rejected husband's position that his desire to avoid procreation should be given "conclusive weight," although it characterized this factor as "substantial." The court found that husband's stated concern about having a child born from the pre-embryos who was genetically his child but whom he would not raise was inconsistent with his actions in agreeing to donate the embryos in other scenarios. And because the parties had agreed to donate the pre-embryos in other scenarios, the court surmised that they had given more weight to wife's "fundamental beliefs" (that the pre-embryos were human lives and should not be destroyed) than to husband's interest in avoiding undesired procreation. Thus, the court

weighted husband's subjective concerns about donating the pre-embryos in his favor but "at a level significantly less than the subjective importance of [wife's] desire to avoid destruction of the [pre-]embryos." Balancing all of these factors, the court awarded the pre-embryos to wife.

## C. Analysis

### 1. Preliminary Issues

¶ 28 Because wife's argument that husband waived his right to avoid procreating when he agreed to create the pre-embryos through IVF is inconsistent with *Rooks II*, we reject it. *See id.* at ¶ 62 ("We do not interpret a party's commencement of the IVF process, on its own, to establish the party's automatic consent to become the genetic parent of all possible children that could result from successful implantation of the pre-embryos.").

¶ 29 We also reject wife's argument on appeal that we should conclude the parties entered into an agreement to preserve the pre-embryos for donation in the event of divorce. The record reflects that although wife testified at the hearing that the parties had orally agreed that any unused pre-embryos would not be destroyed, she admitted that she had no evidence of such an

13

agreement other than her email correspondence with her friend and sister, in which husband did not participate.  Further, wife admitted that the parties did not have an agreement for disposition of the pre-embryos in the event they divorced.

¶ 30    When asked by the district court why, if the parties had chosen donation of the pre-embryos in other instances, they did not also provide for that disposition in the event of divorce, wife responded that they did not discuss what would happen in the event that they divorce and that she wished that she had included such a provision but she thought they would be married forever.

¶ 31    Wife did not argue in her written briefs in the district court that there was an oral agreement between the parties that must be enforced.  She instead consistently described the fertility center's written consent form as the only agreement concerning disposition of the pre-embryos and argued, as she also did at the hearing, that the consent form should be interpreted as indicating an intent that the pre-embryos be donated on divorce.  Although the court found credible wife's testimony that the parties had "discussed" her pro-life beliefs in connection with their decision to undergo IVF, it also found that the IVF agreement did not set forth a standard to be

14

utilized in resolving the dispute in the event of divorce, other than to submit it to the court. *Cf. J.B. v. M.B.*, 783 A.2d 707, 714 (N.J. 2001) (rejecting party's assertion that an oral agreement existed for disposition of the parties' pre-embryos based on their discussions of the issue before undergoing IVF).[4]

¶ 32    Moreover, *Rooks II*, ¶ 72, held that an express agreement between the spouses in the event of divorce would govern and therefore be enforceable. And we discern no error in the district court's conclusion that the parties did not have an agreement on the disposition of the pre-embryos in the event of divorce — except to submit the issue to a court in the event they could not agree. We similarly reject husband's argument in his reply brief that section 19-4-106(7), C.R.S. 2018, which requires both parties' consent to IVF, controls the disposition issue presented here. *See Rooks II*, ¶¶ 51-52 (rejecting similar argument and holding that "consent" in

---

[4] Wife argues for the first time in her answer brief that husband is equitably estopped from arguing that the pre-embryos should be destroyed because she only agreed to IVF on the understanding that any unused pre-embryos would not be destroyed. However, we will not address an argument raised for the first time on appeal. *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶ 18.

section 19-4-106(7) "logically refers to the former spouse's consent to legal parenthood" of a child born as a result of IVF).  We also note that husband's argument is not preserved because it is raised for the first time in his reply brief.  *See In re Marriage of Drexler*, 2013 COA 43, ¶ 24.

### 2.  Case Law on Balancing the Interests of a Party Wanting to Donate Versus Those of Wanting to Avoid Procreating

¶ 33 In weighing the parties' competing interests, the *Rooks II,* court stated that "[a] party who seeks to become a genetic parent through implantation of the pre-embryos, for example, has a weightier interest than one who seeks to donate the pre-embryos to another couple." *Rooks II*, ¶ 66.

¶ 34 And the court noted that "generally" case law from other jurisdictions addressing disposition of pre-embryos on divorce "avoid[s] results that compel one party to become a genetic parent against his or her will except in rare circumstances." *Id.* at ¶ 32. *Rooks*, however, involved a party who wanted to preserve the pre-embryos to become pregnant, not to donate them as wife wants to do here.  *See id.* at ¶ 2.

16

¶ 35    On appeal, husband urges us to adopt this intended use factor as the primary and dispositive factor when one spouse seeks to donate the pre-embryos, rather than use them to have biological children.  We decline to adopt this proposed bright line test.

¶ 36    First, although the opinion in *Rooks II* lists this factor first, it does not state that it has primary or dispositive weight.  It states only that a party wishing to implant and have a child has a weightier interest than a party wishing to donate.  And, in this case, husband does not wish to become a genetic parent through implantation (i.e., by using a surrogate), so the first clause is not dispositive in weighting his interest against wife's.

¶ 37    *Rooks II* cited two cases from other jurisdictions in which a spouse's interest in discarding pre-embryos so as to avoid becoming a genetic parent was pitted against a spouse's interest in preserving pre-embryos to donate to another couple.  *Id.* at ¶ 66 (citing *J.B.*, 783 A.2d at 716-17; *Davis v. Davis*, 842 S.W.2d 588, 603-04 (Tenn. 1992)).

¶ 38    *Davis* stated that in this circumstance, "[o]rdinarily, the party wishing to avoid procreation should prevail."  842 S.W.2d at 604; *see also J.B.*, 783 A.2d at 716.  The *Davis* court upheld the lower

court's disposition under the balancing of interests test in favor of the party who did not want to procreate. 842 S.W.2d at 604. That party — the husband — asserted that he was "vehemently opposed to fathering a child that would not live with both parents" because, as a child, he had been sent to a home for boys after his parents divorced and had "severe problems" as a result. *Id.* at 603-04. The court credited the husband's testimony, and also found that the wife's interest in donating, which it described as her having to know "that the lengthy IVF procedures she underwent were futile, and that the pre[-]embryos to which she contributed genetic material would never become children," was not as significant as the husband's interest. *Id.* at 604.

¶ 39     The New Jersey court approved of the *Davis* rule that ordinarily a party wishing to avoid procreation should prevail, and it also ruled in favor of destroying the pre-embryos. *J.B.*, 783 A.2d at 716-17.

¶ 40     Although the *Davis* court noted that "[t]he case would be closer if [the wife] were seeking to use the pre[-]embryos herself," 842 S.W.2d at 604, it did not hold that an objecting party must *always* prevail when the other party wants to donate rather than

18

have a child using the pre-embryos. To the contrary, it clarified that the rule it was announcing "does not contemplate the creation of an automatic veto" for an objecting party. *Id.* Neither of these cases adopted the bright line test urged by husband.

### 3. The Parties' Competing Constitutional Rights

¶ 41 Husband argues that wife's "right to procreate is less impacted, if impacted at all," if she is not permitted to donate the pre-embryos and that her right only "manifests at the moment of implantation [of the pre-embryos] in her uterus." *See J.B.*, 783 A.2d at 717 (preventing donation or use of the pre-embryos would not impair the husband's right to procreate). Accordingly, he further argues, the district court erred in treating the parties' constitutional rights as equivalent.

¶ 42 The court did not treat the parties' rights as equivalent, however. Rather, it noted that "there is a constitutional dimension" to wife's interest in preserving the pre-embryos for donation to another couple and thus both parties' "competing interests . . . are grounded in constitutional rights." The court did not err in making this statement.

¶ 43    The supreme court similarly noted in *Rooks II*, ¶ 35, that the parties' competing interests in this situation "derive from constitutional rights in the realm of reproductive choice."  Further, wife's right, as well as husband's, in this area includes not only the right to procreate or not procreate, but also the right to make decisions about the fate of the pre-embryos that were created using their genetic material.  *See Davis*, 842 S.W.2d at 601-03 (describing the parties — the wife, who wanted to donate the pre-embryos, and the husband, who wanted to discard them — as "entirely equivalent gamete-providers," both with "decisional authority" over whether to continue gestating the pre-embryos); *see also Rooks II*, ¶¶ 35-38 (discussing case law around reproductive rights and noting the importance of individual choice and autonomy in decision-making).

### 4.  Husband's Interest in Avoiding Procreation

¶ 44    Although husband claimed a similar interest to that asserted by the husband in *Davis* — that he never knew his own father and did not want to have a genetic child whom he would not raise and who also might not have a father in his or her life — the district court found his assertion not credible.  It noted that if his concern "was so compelling that he could not accommodate the prospect of

20

his biological child being raised by someone else other than himself, how could he have agreed the [pre-]embryos should be donated to another couple in the event [wife] attained the age of fifty-five or in the event of his and [wife's] mutual death?" According to the court, this inconsistency "dissipate[d] [husband's] argument that this factor should weigh heavily in his favor."

¶ 45    We conclude that the district court did not abuse its discretion in weighting husband's interest in this manner. We agree with *Davis*'s ruling that *ordinarily* a party not wanting to procreate should prevail when the other party wants to donate the pre-embryos instead of using them to have a child of his or her own. *See* 842 S.W.2d at 604; *see also Rooks II*, ¶ 32. But, we also agree with the district court and with *Davis* that an objecting party's interest is not a veto power and therefore is not conclusive in a balancing analysis. *See* 842 S.W.2d at 604.

¶ 46    Moreover, determining credibility is the district court's prerogative. *In re Marriage of Farr*, 228 P.3d 267, 270 (Colo. App. 2010). And the court's observations relative to its credibility determination here are supported by the record. Whereas in *Davis* the parties had not entered into any agreement for disposition of

their pre-embryos, 842 S.W.2d at 590, here husband twice agreed that in scenarios other than divorce the pre-embryos would be donated to another couple. As the district court noted, his decision to elect donation in these other scenarios unavoidably conflicts with his claimed "core belief" that he did not want his biological child being raised by someone else and potentially without a father, as he had been raised.

¶ 47 At the hearing, after husband stated his concerns about donating the pre-embryos, the district court asked him directly about the inconsistency in his position relative to his previous agreement to donate in other scenarios:

> But let me push back and don't take this in an offensive way, but just try to explain to me the difference. So if that's true, why would it be acceptable to donate in the event of your death or the other category that was set forth in the contract, to donate in the event that you reached 56 and didn't otherwise address this position? So why aren't those sort of overriding concerns that you have about the absence of a father equally applicable in those cases?

In response, husband did not say that he had changed his mind but rather attempted to distinguish the two situations:

I think there would be a guarantee. There would be a definite definition. If I was dead, my child, if it was out there and planted in somebody else, would know. There's the possibility they would know I'm not around. I don't know. It's just something that's there that I'm thinking about constantly. It's like the most logical thing that you think about. If you're 55 or 56 and we were still together, me and [wife], even though there's a document there, it's still something that you would talk about. Obviously we can't talk about things and make decisions together. That's why we're here all the time unfortunately. You have to be — I can't really say being what I would do with putting myself out there 14 years from now. So it's — I don't know. It's hard for me to say.

¶ 48    Husband did not argue in the district court that he was entitled to and in fact had changed his mind about his previous agreement to donate the pre-embryos. Thus, because it was not shown to be clearly erroneous, we must accept the district court's finding that husband either overstated his "core belief" about the prospect of his biological child being raised by someone other than himself, or recognized that the wife's "competing value is entitled to greater weight."

¶ 49    Additionally, the district court noted that fewer than two years had elapsed from when the parties signed the agreement, in which

23

they agreed to donate the pre-embryos in other scenarios, and the dissolution proceedings began. Therefore, it found unlikely that "the parties' core beliefs and values" had evolved significantly in this short time.

¶ 50 The district court appropriately weighted the husband's testimony under the factor of husband's personal view of the moral responsibility to have a meaningful presence in the life of a child he aided in conceiving.

### 5. Wife's Interest in Donating the Pre-Embryos

¶ 51 By stating initially that wife's interest in donating the pre-embryos was "less important" than if she had planned to use the pre-embryos to have another child herself, the district court appeared to accord appropriate weight to wife's interest. *See Rooks II*, ¶ 66 ("A party who seeks to become a genetic parent through implantation of the pre-embryos, for example, has a weightier interest than one who seeks to donate the pre-embryos to another couple."); *see also J.B.*, 783 A.2d at 716; *Davis*, 842 S.W.2d at 604. We read this statement from *Rooks II* to mean that a party's interest in seeking to donate is still entitled to some weight, but not as great a weight as if the party sought to use the pre-embryos herself.

¶ 52    However, the district court identified what appears to be a corollary factor that turned on the "the parties' personal views of the morality of discarding fertilized embryos" and weighted that factor heavily in favor of wife. Nothing in *Rooks I* or *Rooks II* suggests that the weight to be attributed to a party's interest in donating should in any way turn on that party's personal views of the morality of donating. Moreover, *Rooks II* did not recognize, as it could have, that certain uses of the pre-embryos — such as implantation or donation — were for a "productive purpose" and thus entitled to greater weight in the balancing calculus. To the contrary, attributing such weight in this case appears to be inconsistent with the supreme court's conclusion that pre-embryos are not persons under Colorado law. *See Rooks II*, ¶ 56.

¶ 53    Although the district court had clarified at the beginning of its balancing analysis, consistent with Colorado law, *see id.*, that "the legal system does not view an embryo as a human life" and that the parties' dispute "cannot be resolved based upon a perception that the [pre-]embryos must be protected as human life," it then did just the opposite by weighting "heavily" wife's personal beliefs that the pre-embryos were human lives and describing her interest in

donating them as a "productive purpose" as compared with husband's intent to discard them. By applying this new factor of personal moral views, the district court effectively restored *conclusive* weight to wife's side of the balancing equation because "she is seeking to utilize the embryos for a productive purpose rather than simply discard them as [husband] proposes." In characterizing wife's purpose to donate as "productive" and husband's purpose as "simply discard[ing]," the court credited wife's personal beliefs that the pre-embryos were human lives and treated donation as an innately and unavoidably superior purpose to discarding. By relying on this factor, the district court tilted the scale in favor of the party seeking to donate and thus abused its discretion by inserting a factor not recognized in *Rooks II* and that is seemingly inconsistent with that decision. *See id.* at ¶¶ 32, 66; *J.B.*, 783 A.2d at 716; *Davis*, 842 S.W.2d at 604.

¶ 54     We recognize that the factors identified in *Rooks II* are not exhaustive. *Rooks II,* ¶ 71 ("Factors other than the ones described above may be relevant on a case-by-case basis."). But the factors that a court adds — like the five expressly identified in *Rooks II* — must be in service of balancing the competing constitutional

26

interests at stake, namely, "the parties' individual interests in either achieving or avoiding genetic parenthood through use of the disputed pre-embryos." *Id.* at ¶ 64. And the relative strength or sincerity of the parties' respective personal or moral convictions, as a separate additional factor, does not advance the court's charge of giving primacy to one of "the equivalently important, yet competing, right to procreate and right to avoid procreation." *Id.* at ¶ 74.

¶ 55    The district court found that wife's subjective beliefs were "bona fide, passionate, and antedate this dispute." While this finding is certainly supported by the record, wife's beliefs are also contrary to established law regarding pre-embryos and, as such, were ultimately weighted too heavily by the district court vis-a-vis husband's constitutional right to avoid procreating using the pre-embryos. *Cf. J.B.*, 783 A.2d at 712, 716-17 (resolving issue in favor of party seeking to destroy pre-embryos to avoid procreating despite the other party's desire to donate the pre-embryos consistent with his religious convictions that the pre-embryos must be protected as human life).

¶ 56    To be sure, although wife is constitutionally entitled to her sincerely held personal moral beliefs, such beliefs cannot be

27

accorded dispositive weight.[5]  *See id.*; *Davis*, 842 S.W.2d at 604; *see also Rooks II*, ¶¶ 32, 66.  Moreover, to the extent the supreme court in *Rooks II* identified hardship or emotional toll as a consideration, it was only with respect to "the spouse seeking to avoid becoming a genetic parent."  *Rooks II*, ¶¶ 4, 69, 74.

¶ 57    For all of these reasons, we remand the case for the district court to rebalance the parties' interests in accord with *Rooks II*.  As set forth in this opinion, the court should do so without weighting wife's subjective belief that the pre-embryos should be protected as human life more heavily than husband's interest in not procreating using the pre-embryos.  Further, because the court and the parties did not have the guidance of *Rooks II* during the earlier hearing, both parties should be afforded the opportunity to present the district court with additional evidence and argument if either party wishes to do so.

---

[5] On appeal, wife appears to argue that her right to donate the pre-embryos implicates her right to free exercise of her religious beliefs.  If this argument was raised below, it was not addressed by the district court.  Moreover, wife cites no authority for the proposition that free exercise of religious beliefs is implicated in a case involving the allocation of pre-embryos as marital property of a special character.

## IV. Wife's Request for Appellate Attorney Fees

¶ 58 Wife requests appellate attorney fees under C.A.R. 38(b) and section 13-17-102, C.R.S. 2018. We deny the request.

¶ 59 Wife requests fees based on husband's first issue, in which he argues that the contemporaneous mutual consent approach applies instead of the balancing of interests approach — a position supported by the dissent in *Rooks II*, ¶¶ 76-109. Husband abandoned this issue, however, in his supplemental brief after the *Rooks II* court adopted the balancing of interests approach. Accordingly, attorney fees are not appropriate. *See Mission Denver Co. v. Pierson*, 674 P.2d 363, 365 (Colo. 1984) ("Standards for determining whether an appeal is frivolous should be directed toward penalizing egregious conduct without deterring a lawyer from vigorously asserting his client's rights."); *cf.* § 13-17-102(5) (attorney fees shall not be assessed if a claim is dismissed within a reasonable time after the party knew or reasonably should have known that he or she would not prevail on the claim).

## V. Conclusion

¶ 60     The judgment is reversed, and the case is remanded for the district court to rebalance the parties' interests consistent with this opinion.

JUDGE NAVARRO and JUDGE WELLING concur.