The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 16, 2025

## 2025COA83

**No. 24CA0590, *Elken v. Bain* — Family Law — Parents and Children — Assisted Reproduction — Embryos — Unmarried Parties**

In this declaratory judgment action regarding the disposition of pre-embryos, a division of the court of appeals concludes that the multi-factor balancing test adopted by the Colorado Supreme Court in *In re Marriage of Rooks*, 2018 CO 85 — a framework developed in the context of a dissolution of marriage proceeding — applies to a dispute between nonmarried individuals. The division also concludes that the district court correctly applied the *Rooks* framework to a situation in which one party seeks to implant the pre-embryos to have a genetic child, while the other party seeks to donate them to avoid sharing a genetic child with the first party. Finally, the division concludes that the district court did not abuse

its discretion in balancing the *Rooks* factors. Accordingly, the division affirms the judgment.

Court of Appeals No. 24CA0590
City and County of Denver District Court No. 23CV30717
Honorable Mark T. Bailey, Judge

Rachael Elken,

Plaintiff-Appellant,

v.

Tyler Bain,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE BROWN
J. Jones and Yun, JJ., concur

Announced October 16, 2025

Burg Simpson Eldredge Hersh & Jardine, P.C., Michael S. Burg, D. Dean
Batchelder, Patrick M. Sweet, Elizabeth N. Torma, Englewood, Colorado, for
Plaintiff-Appellant

Tyler Bain, Pro Se

¶ 1     Plaintiff, Rachael Elken, appeals the district court's judgment ordering that she and defendant, Tyler Bain, donate four cryogenically frozen pre-embryos they created before their relationship ended.  Elken contends that the district court (1) misapplied the multi-factor balancing test developed by the Colorado Supreme Court in *In re Marriage of Rooks*, 2018 CO 85; and (2) abused its discretion in balancing the *Rooks* factors.

¶ 2     In resolving this case, we first conclude that the *Rooks* framework, which was developed in the context of a dissolution of marriage proceeding, applies to a dispute between nonmarried individuals over the disposition of pre-embryos created from their genetic material.  We also conclude that the district court correctly applied the *Rooks* factors to a situation in which one party seeks to implant the pre-embryos to have genetic children, while the other party seeks to donate them to avoid sharing a genetic child with the first party.  Finally, we conclude that the court did not abuse its discretion in weighing the *Rooks* factors in this case.  Accordingly, we affirm the judgment.

## I. Background

¶ 3    Rachael Elken and Tyler Bain began a romantic relationship in 2018.  Bain had two children from a previous marriage, while Elken had none.  During their relationship, Elken and Bain wanted to start a family together — Bain even reversed his vasectomy, and Elken purchased a home large enough to accommodate Bain's two children and any future children they might have together.

¶ 4    After unsuccessfully trying to conceive children naturally, Elken contacted the Colorado Center for Reproductive Medicine (CCRM).  Following a discussion of the various options, Bain and Elken decided to use in vitro fertilization (IVF) to combine their genetic material and create pre-embryos.

¶ 5    Bain and Elken signed a CCRM form agreement titled "Disposition of Embryos and Declaration of Intent."  The CCRM agreement clarified what the parties wanted CCRM to do with the pre-embryos in four situations: Elken's death; Bain's death; the parties' simultaneous deaths; and "Divorce, Dissolution of Relationship, or Discontinuation of IVF Treatment."  As relevant here, in the event their relationship ended, Elken and Bain agreed to the following option: "A court decree, settlement agreement, or

2

written instructions signed by each party and notarized will be presented to [CCRM] directing use to achieve a pregnancy in one of us or anonymously donate the embryos to another couple for reproductive purposes . . . ."

¶ 6    CCRM created four viable pre-embryos from Elken's and Bain's genetic material. A few months later, an argument between Elken and Bain escalated into physical violence. The details of the incident are disputed, but the altercation led to the end of their relationship. Bain then independently contacted CCRM to request that it "stop the [IVF] process."

¶ 7    Over the next several months, the parties could not reach an agreement regarding the fate of their pre-embryos. In March 2023, Elken filed a complaint for declaratory relief, seeking possession of the pre-embryos under the CCRM agreement so that she could use them to become a genetic parent.

¶ 8    Following a two-day bench trial, the district court made detailed findings of fact and carefully balanced the parties' respective interests under the *Rooks* factors. The court concluded that "Mr. Bain's interest in procreative autonomy outweighs Ms. Elken's interest in the use of these four [pre-]embryos" and ordered

that the pre-embryos be anonymously donated to another couple for reproductive purposes. The court stayed its judgment pending this appeal.

## II. The *Rooks* Framework Applies to Nonmarried Individuals Who Have Created Pre-Embryos

¶ 9 *Rooks* involved a divorcing couple's dispute over the disposition of their cryogenically frozen pre-embryos. *Rooks*, ¶¶ 2-4. Although the matter could have been characterized simply as a dispute over "the equitable division of marital property in a divorce proceeding," the supreme court acknowledged that "the parties' competing interests in the disputed pre-embryos derive from constitutional rights in the realm of reproductive choice," not from the right to marry. *Id.* at ¶ 35. Indeed, "[t]he decision whether to bear or beget a child is a constitutionally protected choice." *In re Romero*, 790 P.2d 819, 822 (Colo. 1990). Consequently, deciding the fate of the pre-embryos after a relationship ends "presents difficult issues of procreational autonomy for which there are no easy answers because it pits one spouse's right to procreate directly against the other spouse's equivalently important right to avoid procreation, and because the fundamental liberty and privacy

4

interests at stake are deeply personal and emotionally charged." *Rooks*, ¶ 3.

¶ 10    Even though the parties here were never married, they agree that the *Rooks* framework should apply to the dispute over their pre-embryos. We do too. Notwithstanding the supreme court's characterization of the pre-embryos in *Rooks* as "marital property of a special character," it was individual "autonomy over decisions involving reproduction" that animated the balancing test the court adopted to resolve the dispute. *Id.* at ¶ 64. The supreme court even clarified that "the framework [it] adopt[ed] in this special context is distinct from, and more narrow than, the trial court's consideration of various factors in determining equitable distribution of other forms of marital property." *Id.* Regardless of whether the parties are married, their "individual interests in either achieving or avoiding genetic parenthood through use of the disputed pre-embryos" are implicated just the same. *Id.*

¶ 11    Thus, we conclude that a trial court should apply the *Rooks* framework to resolve disputes between unmarried parties as to the disposition of pre-embryos they jointly created. *See Szafranski v. Dunston,* 2015 IL App (1st) 122975-B, ¶ 3, 34 N.E.3d 1132, 1137

5

(applying a *Rooks*-like framework to resolve a dispute between unmarried parties over the disposition of their pre-embryos). We set forth that framework next, modifying the language used in *Rooks* to facilitate its application outside the context of a dissolution of marriage proceeding.

¶ 12     When the genetic contributors cannot agree on the disposition of their frozen pre-embryos, a court must apply a two-part framework to balance the parties' "equally valid, constitutionally based interests in procreational autonomy." *Rooks*, ¶ 72. A court must first "look for an enforceable agreement between the parties regarding the disposition of the pre-embryos" in the event their relationship ends. *Id.* at ¶ 62. If the parties do not have such an agreement, or if their agreement is not dispositive, the court must weigh the following nonexhaustive factors:

1. the intended use of the pre-embryos by the party who wants to preserve them (for example, whether the party wants to use the pre-embryos to become a genetic parent or wants to donate them), *id.* at ¶ 66;

2. the demonstrated physical ability (or inability) of the party seeking to implant the pre-embryos to have biological children through other means, *id.* at ¶ 67;

3. the parties' original reasons for undertaking IVF (for example, whether the couple sought to preserve a party's future ability to bear children in the face of fertility-implicating medical treatment), *id.* at ¶ 68;

4. the hardship for the party seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations, *id.* at ¶ 69;

5. a party's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage, *id.* at ¶ 70; and

6. any other considerations relevant to the parties' specific situation, *id.* at ¶ 71.

¶ 13    A court should not consider whether a party seeking to become a genetic parent can afford a child or could adopt a child or otherwise parent nonbiological children. *Id.* "Nor shall the sheer number of a party's existing children, standing alone, be a reason to preclude preservation or use of the pre-embryos." *Id.*

¶ 14     "Considering the nature and equivalency of the underlying liberty and privacy interests at stake, a court . . . should strive, where possible, to honor both parties' interests in procreational autonomy when resolving disputes over a couple's cryogenically preserved pre-embryos." *Id.* at ¶ 4.  But a court should also generally avoid compelling one party to become a genetic parent against that party's will, except in rare circumstances.  *In re Marriage of Fabos*, 2019 COA 80, ¶¶ 34, 45 (*Fabos I*); *In re Marriage of Fabos*, 2022 COA 66, ¶¶ 14, 43 (*Fabos II*).

III.     The District Court's Application of the *Rooks* Framework

¶ 15     To resolve the parties' dispute over the disposition of their cryogenically frozen pre-embryos, the district court applied the *Rooks* framework and recognized its duty to honor both parties' interests in procreational autonomy, if possible.  Consistent with *Rooks*, the court first considered whether the parties had an enforceable agreement on the disposition of the pre-embryos in the event their relationship ended.  The court noted that the parties selected an option in the CCRM agreement permitting two possible outcomes — either one party could use the pre-embryos to achieve pregnancy or the pre-embryos could be anonymously donated to

another couple for reproductive purposes. However, because the parties could not agree on one of the two options, the court found that the CCRM agreement was not dispositive and proceeded to analyze and weigh the *Rooks* factors.

¶ 16     *Factor 1: Intended use by the party who wants to preserve the pre-embryos.* The court considered Elken to be the party who intended to preserve the pre-embryos and found that she wished to use them to attempt to become pregnant. The court recognized that "Elken's intended use of the embryos to become a genetic parent is entitled to significant weight under the [*Rooks*] analysis."

¶ 17     *Factor 2: Demonstrated physical ability or inability to have biological children through other means.* The court noted Elken's age — she was thirty-eight years old when she commenced the action — and relied heavily on her fertility expert's testimony to evaluate this factor. The court identified four possible avenues for Elken to become a genetic parent. First, a natural pregnancy was "still possible," though the expert could not estimate "the odds of this happening." The court ranked the remaining three possibilities by likelihood of success: (1) using the four pre-embryos created with Bain's genetic material; (2) combining her eggs with anonymously

9

donated sperm to create a pre-embryo; and (3) undergoing donor sperm insemination. Regarding the second option, the court found that, after the dispute over the pre-embryos arose, Elken underwent two additional egg retrieval procedures and harvested twenty eggs that would likely yield three viable pre-embryos after accounting for "attrition." The expert saw no reason why Elken could not harvest more eggs before the age of forty-five.

¶ 18 Ultimately, the court found that Elken had "not demonstrated an inability to have biological children" and that she had "other options for becoming a mother." But it also found that Elken had shown "that these [four] [pre-]embryos are her best chance of becoming a genetic mother and taking them away will reduce her chances." The court explained that, "[g]iven the uncertainties inherent in IVF and pregnancy, this is a very significant factor," and it gave "great weight to [Elken's] interest here too."

¶ 19 *Factor 3: The parties' original reasons for undertaking IVF.* The court made detailed findings about the parties' relationship and their original reasons for pursuing IVF. It found credible and compelling Elken's testimony that it had been "her dream to be a mother since she was a child." Although Elken testified that her

"primary goal was to preserve her ability to be a mother with or without [Bain] as a partner," the court found that both parties' "primary intention at the time the embryos were created[] was to use them to make a family."

¶ 20 The court likewise found credible Bain's testimony that "his intention was to form a family with [Elken,] not simply to provide genetic material so that [Elken] could be [a parent] with or without his involvement." It found that "Bain provided his sperm because he wanted to make a family." Although the court did not specify how much weight it assigned this third factor, its analysis suggests that this factor weighed in favor of Bain given that the parties' primary intent in creating the pre-embryos — to create a family together — was no longer achievable after their relationship ended.

¶ 21 *Factor 4: The hardship for the party seeking to avoid becoming a genetic parent.* In analyzing this factor, the court identified Bain as the party seeking to avoid becoming a genetic parent, specifically *with Elken.* The court disagreed with Elken's view that Bain would not be significantly harmed if she had his child because she had "agreed to absolve [Bain] of all financial and other responsibilities of parenthood." Instead, the court found that Bain "was telling the

11

truth" when he testified that "he would not be able to walk away and not be a part of the child's life if [Elken] had his baby."

¶ 22      The court also noted Elken's argument that, by not choosing the option in the CCRM agreement to discard the pre-embryos in the event their relationship ended, Bain had agreed to become a genetic parent, so he should allow Elken to be the other parent to that child. But the court credited Bain's testimony that "he would suffer extreme emotional hardship if he were forced to become a parent and then co-parent the child with [Elken]." The court reasoned, "It is one thing to donate [pre-]embryos anonymously, but it is a very different thing for your former partner to raise your child in your community." The court found that Bain would experience "significant emotional, financial, and logistical hardship."

¶ 23      *Factor 5: A party's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage.* The court observed that neither party argued that this factor applied.

¶ 24      *Any other considerations relevant to the parties' specific situation.* The court did not appear to make findings on any additional considerations beyond those articulated in *Rooks*.

¶ 25    After weighing these factors, the district court concluded that "Mr. Bain's interest in procreative autonomy outweighs Ms. Elken's interest in the use of these four [pre-]embryos." It denied Elken's request for declaratory relief and ordered that the pre-embryos be anonymously donated to another couple for reproductive purposes.

## IV. Elken's Contentions

¶ 26    Elken contends that the district court (1) misapplied *Rooks* and (2) abused its discretion by weighing the *Rooks* factors in Bain's favor. We are not persuaded.

### A. The District Court Correctly Applied the *Rooks* Factors

¶ 27    Elken contends that the district court misapplied *Rooks* by (1) failing to recognize that a person seeking to become a genetic parent has a weightier interest than one who seeks only to donate pre-embryos and (2) considering a "self-imposed" hardship to the party seeking to donate the pre-embryos. Reviewing de novo, *see Fabos II,* ¶ 15 ("Whether a district court applied the correct legal standard is an issue we review de novo."), we disagree.

### 1. The District Court Correctly Afforded Elken's Interest in Becoming a Genetic Parent Greater Weight Than Bain's Interest in Donation

¶ 28    Elken's weightier-interest argument focuses on the court's application of the first *Rooks* factor — "the intended use of the party seeking to preserve the disputed pre-embryos." *Rooks*, ¶ 66. *Rooks* made clear that both the right to procreate and the right to avoid procreation are "equivalently important" constitutionally based rights. *Id.* at ¶ 74; *see Fabos II*, ¶ 33. But it also explained that "[a] party who seeks to become a genetic parent through implantation of the pre-embryos . . . has a weightier interest than one who seeks to donate the pre-embryos to another couple." *Rooks*, ¶ 66. Relying on this language, Elken asserts that the district court should have given her interest in using the pre-embryos greater weight than Bain's interest in donating them.

¶ 29    But the district court afforded Elken's interest greater weight. In assessing this factor, the court explained that "a party's interest in seeking to donate does not have as great [a weight] as if the party sought to use the pre-embryos herself," and it reasoned that "Elken's intended use of the pre-embryos to become a genetic parent is entitled to significant weight under the *Rooks* analysis."

Although the court did not expressly say that Bain's interest was inferior to Elken's under the first *Rooks* factor, its order clearly demonstrates that it weighed this factor heavily in Elken's favor. Thus, we perceive no error in the district court's application of the first *Rooks* factor.

¶ 30    Despite acknowledging that "this factor may not be dispositive on its own," Elken nevertheless contends, relying on *Fabos II*, that "it should 'ordinarily' be the case that the party pursuing donation of the pre-embryos loses when pitted against" a party seeking to use the pre-embryos to become pregnant. Rather than identifying a misapplication of the law, this argument challenges how the district court exercised its discretion in balancing this factor against the other *Rooks* factors, an issue we take up in Part IV.B. But to the extent Elken contends that she should have prevailed as a matter of law, her argument extends *Fabos II*'s rationale too far.

¶ 31    In *Fabos*, the wife wanted to donate the frozen pre-embryos to another couple while the husband sought to have them discarded. *Fabos II*, ¶ 3. The division noted that, under *Rooks*, both the right to procreate and the right to avoid procreation are "equivalently important" constitutionally based rights. *Id.* at ¶ 33 (quoting *Rooks*,

15

¶¶ 3, 74). From there, it reasoned that a party's desire to implant pre-embryos to achieve genetic parenthood and a party's desire to avoid genetic parenthood likewise are "equivalently important." *Id.* But "because a party's desire to donate pre-embryos is entitled to less weight than a party's desire to implant them, a party's desire to donate must also be entitled to less weight than a party's desire to avoid genetic parenthood." *Id.* As a result, the division concluded that the trial court erred by weighing the wife's desire to donate as equivalent to a desire to implant and thus equivalent to the husband's desire to avoid genetic parenthood. *Id.* at ¶ 29. But rather than remanding for the trial court to rebalance the *Rooks* factors, the division concluded, as a matter of law, that the case was a "close call" and thus "not one of the rare circumstances in which a court may compel a party to procreate against their will." *Id.* at ¶¶ 43, 46. The division directed entry of judgment for the husband on remand. *Id.* at ¶ 58.

¶ 32    In reaching this conclusion, the *Fabos II* division relied in part on the *Fabos I* division's reasoning that "[o]rdinarily a party not wanting to procreate should prevail when the other party wants to donate the pre-embryos instead of using them to have a child of

16

[their] own." *Fabos II*, ¶ 46 (quoting *Fabos I*, ¶ 45). Based on this language, Elken argues that, because a party seeking to implant the pre-embryos to achieve genetic parenthood is on equal footing with a party not wanting to procreate, it should follow that, ordinarily, a party seeking to implant the pre-embryos should prevail when the other party wants to donate them. According to Elken, had the court given her this "strong presumption," she should have prevailed.

¶ 33    But *Fabos I* drew the relevant principle from *Rooks*' survey of how other jurisdictions have resolved disputes over the disposition of pre-embryos. *Fabos II*, ¶ 23 n.2. *Rooks* explained that, although courts have taken various approaches, they all generally seek to "avoid results that compel one party to become a genetic parent against [their] will except in rare circumstances." *Rooks*, ¶ 32.

¶ 34    A party seeking to implant pre-embryos — in their own body or in the body of a partner — has chosen to become a genetic parent. Requiring that party to donate pre-embryos does not compel them to become a genetic parent against their will and does not infringe upon that party's procreational autonomy to the same extent as it would infringe on the rights of a party seeking to avoid

17

genetic parenthood altogether. Consequently, we decline Elken's invitation to hold that a party seeking to implant pre-embryos to become a genetic parent should ordinarily prevail over a party seeking to donate the pre-embryos, except in rare circumstances.[1]

2.	The District Court Was Permitted to Consider Bain's Hardship

¶ 35	Elken contends that the district court erred by considering the hardship to Bain as the party seeking to donate the pre-embryos. She argues that the fourth *Rooks* factor only permits the court to consider hardship to the party "seeking to avoid becoming a genetic parent." *Rooks*, ¶ 4. According to Elken, because Bain would become a genetic parent even if the pre-embryos are donated, the court erred by considering any hardship to him that might result from her using the pre-embryos to become pregnant with his child.

---

[1] We do not intend to undermine the general rule that "[a] party who seeks to become a genetic parent through implantation of the pre-embryos . . . has a weightier interest than one who seeks to donate the pre-embryos to another couple." *In re Marriage of Rooks*, 2018 CO 85, ¶ 66; *see In re Marriage of Fabos*, 2019 COA 80, ¶ 51 (*Fabos I*) ("[A] party's interest in seeking to donate is still entitled to some weight, but not as great a weight as if the party sought to use the pre-embryos herself.").

¶ 36 We acknowledge that there is no outcome here by which Bain necessarily avoids becoming a genetic parent.[2] For his part, Bain acknowledges this too. His stated desire is not to avoid genetic parenthood entirely, but "to avoid genetic parenthood with someone . . . with whom he shares an irreparably damaged relationship."[3] In other words, Bain's hardship stems not from his inability to avoid genetic parenthood generally but from his inability to avoid genetic parenthood *with Elken.*

¶ 37 We also acknowledge that the supreme court articulated the fourth *Rooks* factor as "consideration of hardship for the person *seeking to avoid becoming a genetic parent,* including emotional, financial, or logistical considerations." *Id.* at ¶ 69 (emphasis added). But the supreme court developed its balancing test in a specific factual context — in which one party sought to procreate with the pre-embryos and the other sought to discard them — so it

---

[2] Of course, if the donated pre-embryos do not result in the birth of a child, neither party will become a genetic parent through use of the disputed pre-embryos.

[3] Bain also asserts that he wishes to avoid genetic parenthood with "someone who has assaulted him." Although the district court found that Elken and Bain "had a major argument that escalated into physical violence," it did not find that Elken assaulted Bain.

19

is not surprising that it articulated this factor in these binary terms. We do not read *Rooks* as prohibiting a court from considering the extent to which a party may seek to avoid becoming a genetic parent *on terms they find objectionable. See Fabos I,* ¶ 43 (The parties' rights "in this area include[] not only the right to procreate or not procreate, but also the right to make decisions about the fate of the pre-embryos that were created using their genetic material.").

¶ 38    We are not persuaded otherwise by Elken's reliance on *Fabos I*, in which the division criticized the trial court for awarding pre-embryos to the wife for donation after giving conclusive weight to her moral and religious beliefs that pre-embryos were human lives. *Id.* at ¶ 56. In relevant part, the *Fabos I* division said that "to the extent the supreme court in [*Rooks*] identified hardship or emotional toll as a consideration, it was only with respect to 'the spouse seeking to avoid becoming a genetic parent,'" not the spouse seeking to donate the pre-embryos. *Id.* (quoting *Rooks*, ¶ 4).[4] The division in *Fabos II* similarly recognized the one-sided nature of this

---

[4] The division's primary critique was that the trial court gave dispositive weight to a factor that was "seemingly inconsistent" with *Rooks,* which noted that pre-embryos are not persons under Colorado law. *Fabos I,* ¶¶ 22, 53; *see Rooks,* ¶ 56.

factor, noting that the supreme court did not "identify[] as a corresponding factor the hardship to the person seeking to preserve the pre-embryos if a court authorized the pre-embryos to be discarded." *Fabos II*, ¶ 35. But the *Fabos II* division clarified that it "was proper — and required — for the court to hear evidence concerning wife's religious beliefs about the disposition of the pre-embryos . . . as an additional factor beyond those articulated in *Rooks*." *Id.* at ¶ 34. In other words, even if the court should not have considered wife's beliefs under the fourth *Rooks* factor, it properly considered them as another relevant, case-specific factor. *See Rooks*, ¶ 71.

¶ 39 Thus, we conclude that the district court did not err by considering the hardship to Bain that would result from Elken becoming pregnant with his child, whether under the fourth *Rooks* factor or as another "consideration[] relevant to the parties' specific situation." *Id.* at ¶ 74.

### B. The District Court Did Not Abuse its Discretion in Balancing the *Rooks* Factors

¶ 40 Elken contends that the district court abused its discretion in balancing the relevant *Rooks* factors because her "weightier interest

in using the pre-embryos for procreation should have prevailed over Bain's lesser interest in donating them." We perceive no error.

### 1. Standard of Review

¶ 41　We review the district court's balancing of the parties' respective constitutionally based interests for an abuse of discretion. *Fabos I*, ¶ 21; *Fabos II*, ¶ 16.[5] But "we more carefully scrutinize the district court's determination because it involves the parties' constitutional rights." *Fabos I*, ¶ 21. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues or misapplies the law. *Fabos II*, ¶ 16. In assessing whether the district court abused its discretion, "we do not consider whether we would have reached a different

---

[5] The *Fabos I* division reasoned that an abuse of discretion standard was appropriate because (1) a district court has discretion to equitably divide marital property, and pre-embryos are "marital property of a special character"; and (2) the supreme court has previously applied an abuse of discretion standard to review issues involving competing constitutional rights. *Fabos I*, ¶¶ 19-20 (quoting *Rooks*, ¶ 57). Although the district court here did not divide marital property, we note that courts generally have discretion to equitably divide property in other contexts. *See, e.g., Young Props. v. Wolflick*, 87 P.3d 235, 237 (Colo. App. 2003) (applying abuse of discretion standard to court's partition of property). Thus, we agree with the parties that abuse of discretion is the appropriate standard of review.

result, but only whether the district court's decision fell within the range of reasonable options." *Hudak v. Med. Lien Mgmt., Inc.*, 2013 COA 83, ¶ 8.

### 2. The District Court Did Not Abuse its Discretion by Concluding that Bain's Interest in Procreational Autonomy Outweighed Elken's Interest in Implanting the Pre-Embryos

¶ 42   In arguing that the district court abused its discretion in balancing the relevant *Rooks* factors, Elken highlights facts favorable to her position and asks us to reweigh the factors consistently with her legal arguments. But we have already concluded that the court correctly applied the law, and we decline Elken's invitation to reweigh the evidence. *See In re Estate of Owens*, 2017 COA 53, ¶ 22 (an appellate court may not reweigh evidence or substitute its judgment for that of the trial court).

¶ 43   Elken premises her argument on "the logic that a party seeking to use their own genetic material to achieve a pregnancy ordinarily should prevail over a party seeking donation." As discussed in Part IV.A, we decline to begin with that presumption.

¶ 44   Elken then argues that the district court should have weighed the first and second *Rooks* factors more heavily in her favor. But the court gave "significant weight" and "great weight" to these

factors, respectively.  Even so, with respect to the second factor, the court found that Elken had "not demonstrated an inability to have biological children" and that she had "other options for becoming a mother."  Although Elken argues on appeal that the court based these findings on "possibilities . . . and not probabilities," the court "relied heavily" on the testimony of Elken's fertility expert.  Elken did not object at trial to the admission of the expert's testimony about Elken's reproductive options, so we cannot fault the court for relying on that evidence.  Moreover, determinations about the credibility of witnesses and the weight to be given to the evidence are matters within the sole province of the district court when acting as the fact finder.  *In re Estate of Romero*, 126 P.3d 228, 231 (Colo. App. 2005).

¶ 45    Elken next argues that the court should have weighed the third *Rooks* factor heavily in her favor.  In doing so, she recounts her testimony about her original reasons for pursuing IVF, emphasizing that she wanted to "preserv[e] her ability to have a genetic child."  But the court did not fully credit Elken's testimony on this point, instead concluding that the parties' mutual, primary intent at the time the pre-embryos were created was to use them to

make a family *together*, an intent that could not be realized after their relationship ended. Because the record supports the court's findings and does not refute its credibility determinations, we defer to them. *See Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008) (reviewing courts generally defer to the district court's credibility determinations); *Johnson v. Indus. Claim Appeals Off.*, 973 P.2d 624, 626 (Colo. App. 1997) (appellate courts are bound by a district court's credibility determination unless it would be error as a matter of law to believe the credited testimony). And we see no error by the court in weighing this factor in Bain's favor.

¶ 46    Finally, Elken argues that the court gave too much weight to the emotional, financial, and logistical hardship Bain would experience, characterizing his concern as "somewhat overstated" based on the evidence. Again, Elken essentially asks us to reweigh the evidence, which we will not do. *See Owens*, ¶ 22. The district court found Bain's testimony about this factor compelling, including that he could not walk away if Elken had his child. And it was not persuaded by Elken's arguments that any hardship was "self-imposed" because she had offered to absolve Bain of his

parental responsibilities.  That Elken disagrees with the court's assessment does not demonstrate an abuse of discretion.

¶ 47     In the end, the district court faced an incredibly difficult task — balancing Elken's desire to hold onto her best chance at becoming a genetic parent against Bain's right to avoid becoming a genetic parent with Elken.  Given that "the fundamental liberty and privacy interests at stake are deeply personal and emotionally charged," *Rooks*, ¶ 3, we understand why Elken would like us to reweigh the evidence to reach a different result.  But whether we would have come to a different conclusion is immaterial because the court's decision fell within the range of reasonable options.  *See Hudak*, ¶ 8.  The court did not misunderstand or misapply the law, and there is nothing manifestly arbitrary, unreasonable, or unfair about its decision.  *See Fabos II*, ¶ 16.  In light of the court's

detailed findings and careful application of the *Rooks* factors, we will not disturb its judgment.[6]

## V.    Disposition

¶ 48    We affirm the district court's judgment.

JUDGE J. JONES and JUDGE YUN concur.

---

[6] We reject Elken's attempt to equate the district court's decision with a termination of her parental rights to a genetic child that may result from the use of the pre-embryos, *see Troxel v. Granville*, 530 U.S. 57, 66 (2000) ("[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."), and her argument that the court's balancing of the *Rooks* factors failed to consider the best interest of the child, *see* § 14-10-124, C.R.S. 2025.  It does not appear that Elken preserved these arguments by raising them with the district court.  *See O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1282 (Colo. App. 2010) ("Arguments never presented to, considered by, or ruled upon by a trial court may not be raised for the first time on appeal.").  In any event, the pre-embryos are not children under Colorado law, *see Rooks*, ¶ 55, so Elken has no parent-child relationship with them.